# JOHN FOWLE *versus* TYLER BIGELOW.

The owners of several parcels of land, through which was a private way having a gate across it, entered into covenants, by indenture, for widening the way, &c.; to the indenture was subjoined the following memorandum, *viz.,* "The gate above mentioned is to be kept up, except by the consent of the parties;" — it was holden to be the intent of the parties in the memorandum, that the gate should be upheld until, by agreement, it should be taken down, and then that it was to remain down forever.  [It was also held, that the condition of the premises and the acts of the parties, at the time and immediately subsequent to the execution of the instrument, were admissible in evidence to explain the meaning of the memorandum. — ED.]

THIS was an action of the case for opening and leaving open a gate across a private way, by which the plaintiff's land was exposed to the inroads of cattle, &c.

The action was tried upon the general issue, at the sittings here after the last November term, before *Parker,* J.

The defendant admitted the opening of the gate as alleged, and claimed a right to have the way continue open.

The * way was from land formerly belonging to one  [ *380 ] *Samuel Benjamin* to the public highway.   The said *Samuel,* on the 15th of March, 1791, conveyed it to *William Hunt* and *Samuel Jackson,* "with full liberty to pass and repass, keeping a gate at each end, at the expense of *Hunt* and *Jackson.*"   On the 30th of April, 1792, a deed of partition was made between *Hunt* and *Jackson.*   On the 30th of April, 1795, the same *Benjamin* conveyed land on the north side of the way to *Richard R. Eliot,* who

conveyed the same to *John T. Apthorp*, by whom, on the 13th of July, 1802, it was conveyed to the plaintiff. The defendant owns land, and has a house, on the other side of the way, deriving his title from *Daniel Sanger*, by deed dated the 21st of November, 1808. On the 13th of April, 1805, covenants were made between *John Fowle*, then the owner and occupant of land on the north side of the way, and *Richard Sanger* and *Daniel Sanger*, the owners and occupants of land on the other side of the way, relative to widening said way, then existing as a privilege and appurtenance of their respective tenements and lands bounded thereon. The portion of land to be contributed by each of the parties, for the purpose of widening the road, is distinctly stated ; each covenants to set his fence accordingly, and to support a fence, as far as his line extends, on the said road ; and in these covenants by *Fowle* and *R. Sanger*, there is a reservation to each of them of one half of the old wall adjoining his land, from the entering of said road, " as far down as the gate across said road near said *Fowle's* house." And then the parties, for themselves, their heirs and assigns, covenant each with the other that they will open said road as aforesaid, and keep the same open, and support the fences as aforesaid, forever. Subjoined to this instrument is a memorandum, expressed in these words : " N. B. The gate above mentioned, across said road, is to be kept up, except by the consent of the parties." After the purchase of the land on the south side of the road, *D. Sanger* assigned to said *Bigelow* all his interest in said cove-

[ *381 ] nants ; and, at the time of *Bigelow's* purchasing, * no gate was standing, nor any posts or other preparations for a gate. The construction given by the plaintiff to the above memorandum was, that either party to the covenant, refusing to have the gate down, might put it up and maintain it. The defendant's construction was, that, as it appeared from the preceding provisions of the indenture, the object of all parties was to open and widen a way from the lands to the public highway ; the only view of the parties in the memorandum was to preserve the gate until all should agree to take it down, and then it was to remain down forever. To prove this, he offered in evidence the deposition of *D. Sanger*, one of the parties to the indenture ; which, being objected to, was rejected, so far as it respects the intention of the parties and their understanding of the memorandum. But he was permitted to prove, and did prove, that a gate had been standing for several years, generally kept shut, until the winter of 1804, when it was off the hinges, and placed alongside the fence ; that at the time of making the covenants aforesaid, the gate was either hung, or the posts were standing, connected with the side fence by a short fence

on each side ; that about a month after the covenants were made, the parties widened the way according to the terms of the covenants ; and that at that time the supporters of the gate were taken up, and the land ploughed up and taken into the way. The plain tiff was present, and either assisted or saw what was done, and no attempt was made to replace the gate until five years afterwards, and two years after the defendant made his purchase. It also appeared, by testimony, that the gate was removed by *Fowle's* direction, and put up on another part of his premises ; and that, after the road was widened, and all obstructions removed, *Fowle* expressed satisfaction with its appearance, and said he intended to give it a name as a street.

Upon this evidence, the judge instructed the jury that, the meaning of the parties in the memorandum being uncertain from the words used, and it being out of his power to ascertain their meaning by reference to the body of the instrument, * evidence of the facts and doings of the parties con- [ *382 ] temporaneously with, and immediately subsequent to, the execution of the instrument, was proper for their consideration , and if by these they were satisfied that, in the understanding of the parties, only a temporary maintenance of the gate was intended, until they should agree upon a time to take it down, their verdict ought to be for the defendant ; otherwise for the plaintiff.

The jury returned a verdict for the plaintiff ; and the defendant moved for a new trial, upon the ground that the jury ought to have been permitted to judge of the construction of the instrument ; also because their verdict was against all the evidence in the cause, and because of the rejection of part of *D. Sanger's* deposition

*Dana* for the plaintiff.

*Ward* and *Bigelow* for the defendant.

SEWALL, J., delivered the opinion of the Court.

The plaintiff's right of action depends altogether upon the question, whether the gate, which the defendant opened and left open, had been lawfully erected by the plaintiff, upon a road over which the defendant claims a right of passing and repassing as in an open road, not liable to any obstructions or encumbrances.

The defendant purchased of *Daniel Sanger*, in 1808, a tract of land bounded on the road. At that time, and for several years before, the road had been open and unencumbered, and it so continued for more than two years afterwards.

The plaintiff contends, however, that this was not an open road of right ; and he rests his title to maintain the gate removed by the defendant, upon the memorandum annexed to the indenture exe cuted on the 13th of April, 1805, by himself, one *Richard Sanger*

and the said *Daniel Sanger*, the defendant's grantor. The road, which, in the body of the instrument, the parties have agreed and established as an open road, to be fenced out and kept open forever, according to the argument for the plaintiff, is to be en- [ * 383 ] cumbered with a * gate at the will of any one of the parties; any one of the three may keep it up; and although all should consent to remove it at any time, yet one may afterwards revoke his consent, and replace the gate.

This is the plaintiff's construction of the *nota bene;* and it is necessary, and must be adopted throughout, to maintain this action. For the gate having been once removed, with the consent of the three contracting parties, at the time when the road was widened, the plaintiff must show a right to replace it, to maintain this action, notwithstanding his concurrence in the removal.

We think it impossible to adopt this construction, for this among other reasons, — that it makes this postscript repugnant to the other parts of the instrument, and subversive of the intentions of the parties, as therein expressed. The instrument is, among the parties to it, to be construed as a grant of an open road; (1) which be- came thereby appurtenant to their several estates, to be enjoyed as an easement and privilege obtained at a common expense. Their purpose of an open and unencumbered road appears in their stipula- tions for fencing it out, as well as in the words in which the road itself is described. And this is so clear, as to justify an entire rejection of the note subjoined to the instrument, if it was capable of no other construction than that given it by the plaintiff's counsel. It is not easy to say what the meaning of it is; and one may con- jecture that the word *not* was omitted in the writing, and that the expression intended was, " the gate is *not* to be kept up, except by consent." But we have no authority to supply this word; and yet to make sense of the clause, we must suppose a much longer sup- plement. The gate is to be kept up, except by consent *it shall be pulled down or removed.* These words must be added; and in this reading, the word *except* has properly the sense of *until;* and then the removal determined the right. The clause was evidently intro- duced for a temporary purpose, and not with any view to control and alter the whole tenor of the instrument, before agreed and settled by the parties.

[ * 384 ] * The construction of written instruments is with the Court. And even when extraneous evidence is admissible to aid the construction, as it may be in some cases, so far as to ascer- tain the circumstances under which the writing was made, and the

(1) 3 *Lev.* 305

subject matter to be regulated by it; yet the Court is to direct the effect of that evidence, and what shall be the construction, if certain facts are proved.

The jury, in the case at bar, were left too much at large in this respect; besides that we think, independently of the extraneous evidence, the additional clause cannot have the meaning given to it which is essential to the plaintiff's right of action; and, with the extraneous evidence, it is manifest that the meaning adopted by the parties at the time was totally different from that now contended for by the plaintiff, judging of the intentions of the parties by their conduct.

The testimony of *Daniel Sanger*, as to his meaning in the covenants to which he was a party, was properly rejected; but the written evidence, and the facts proved for the defendant, of which the evidence was properly admitted at the trial, lead to an opposite conclusion from that which the jury have drawn; and their error is in a matter of law, the construction of the written instrument, in which they are to be directed by the opinion of the Court.

The verdict is set aside, and a new trial is to be granted at the motion of the defendant. (*a*)

(*a*) [The memorandum in this case, being made before the execution of the deed, was to be taken as a part of it. — *Burgh* vs. *Preston,* 8 *D. & E.* 83. — *Brooke* vs. *Smith, Mo.* 679. — *Steadman* vs. *Cox,* 6 *D. & E.* 737. — *Hammond* vs. *Jethuel, Brownl.* 59. — *Thomson* vs. *Butcher,* 3 *Buls.* 302. — *Cook* vs. *Remington,* 6 *Mod.* 237. — *Dixon on Title Deeds,* 545. — *Stocking* vs. *Fairchild,* 5 *Pick.* 181. — Looking only at the memorandum, the plain meaning of it would seem to be, that the gate therein mentioned should be kept up at all times, excepting when, and as long as, the parties from time to time should mutually agree to have it otherwise. And if the report be correct, there was nothing in the other parts of the deed, or in the evidence, if admissible, which contradicted the memorandum. In this view of the case, although the judge at the trial declared that he was unable to ascertain the meaning of the parties, it would seem that the jury rightly understood the matter, and gave a true verdict.

But if there really was an ambiguity on the face of the instrument, it would at least be questionable whether the parol testimony was properly introduced to explain it. — 2 *Phil.* 538, 547, 561, 562, 7th ed. — *Stark.* 4, p. 1041. — In *Halliley* vs. *Nicholson,* (1 *Price,* 404,) it was held that parol evidence, to explain an imperfectly-worded written contract, even where some parts of it were difficult to be understood alone; and that although the chief question in the case was the nature of the contract which had been rendered doubtful by partial and incomplete alteration, and which, therefore, seemed to require to be supplied and perfected by some such additional words as the evidence rejected, would have furnished; and although it contained dubious words, involving in it uncertainty as to whether it purported to be a sale of particular merchandise to arrive by a certain vessel, or of such merchandise generally, whenever the contracting party should receive sufficient to supply the purchaser with the quantity. — See *Doe* vs. *Westlake,* 4 *B. & A.* 57. — *Greaves* vs. *Ashlin,* 3 *Camp.* 426. — That a legal instrument is not to be construed by testimony relative to the acts and understanding of the parties, seems to be well settled. — 2 *Phil.* 7th ed. p. 547. — *Baynham* vs. *Guy's Hospital,* 3 *Ves.* 298. — *Moore* vs. *Foley,* 6 *Ves.* 238. — *Eaton* vs. *Lyon,* 3 *Ves.* 690. — *Inguldin* vs. *May,* 9 *Ves.* 325. — 2 *B. & P.* 452. — *Clifton* vs. *Walmesley,* 5 *D. & E* 566. — ED ]