ALONZO SMITH, Administrator, *vs.* CHARLES FAULKNER & others.

The construction of a contract contained in letters is a question of law for the ( )urt.

The submission of a question of law to the jury is no ground of exception if they decide it aright.

After a manufacturer's death his agent wrote to his factors, announcing that he had since sent them a quantity of goods, and asking them to accept a draft drawn upon the day of the death. They answered, declining to accept the draft until they saw what course would be taken about the estate, but offering to accept it if drawn by the agent in the name of the estate, and with the agent's written guaranty. The agent wrote that he had been appointed administrator, but had not yet been qualified as such, sent them a draft for acceptance, informed them of his intention to send them all the goods, and said: ' As to the guaranty of drafts now made, I am willing to do, so far as I can, in any form you dictate. The drafts now accepted, if not overdrawn above the goods now sent in and being sent in since the decease, I think are safe to you, whether the estate pays or not. Any paper you wish me to sign please send me." They replied, "If you propose sending the goods you are now making to be sold on account of the estate for the payment of this and other drafts, we do not know as we want any guaranty from you." *Held*, that these letters constituted no contract on the part of the administrator that the factors might apply the proceeds of the goods to the payment of the debt due to them from the estate; or if they did, that by the laws of Vermont and Massachusetts an administrator has no power to make such a contract.

THOMAS, J. This is an action of contract, brought to recover the proceeds of sale of certain flannels, consigned to the defendants as commission merchants in Boston, in behalf of the estate of Adam Hobart, Jr., late of Randolph, Vermont, deceased, and damages for not rendering accounts and paying over money alleged to be due. Hobart died on the 16th of July 1852. At the time of his decease he was engaged in running a mill at Northfield, Vermont, for the manufacture of flannels; the plaintiff, Smith, was his agent, and there was then on hand wool in process of manufacture, in all its stages. Smith went on and finished the work, and this, it was admitted, was a prudent act on his part. After the decease of Hobart, and before the appointment of an administrator of his estate, the plaintiff sent to the defendants eleven of the bales of flannel in question, which were substantially finished, though not all made into bales, at the time of Hobart's decease. The remainder of the flannels was sent to the defendants after the appointment of the plaintiff and Lorin Griswold as administrators of

Hobart's . estate, and while they were both acting in that ca-
pacity. Griswold afterwards, on the 10th March 1853, resigned
his office.

The defendants had received goods of the like kind from
Hobart during his life, and had made certain advances thereon
to him by the acceptance of his drafts upon them ; so that at
the time of his decease it appeared that there was due to the
defendants, in their general account with him, about $2500.
The defendants claimed that they had a right, under an alleged
agreement with the plaintiff, (in proof of which they introduced
certain correspondence between them and the plaintiff,) to apply
the net proceeds of the sale of said eleven bales, (about $1200,)
and sufficient of the proceeds of sale of the other flannels sub-
sequently consigned to them by the plaintiff, to pay the balance
due them in their said general account with Hobart, admitting
that after such application there would still be due to the plain-
tiff a balance of about $3000, for which they were liable to him.

The estate of Hobart proved to be deeply insolvent. In the
spring of 1855, after all the goods had been sold and converted
into money, the defendants, through their authorized agent, pre-
sented against the estate, to commissioners who had been ap-
pointed under the laws of the State of Vermont on.the 21st of
July 1852, an account for their balance due at the death of Ho-
bart, deducting the proceeds of the sales of the eleven bales sent
before the appointment of an administrator. The plaintiff, at the
hearing before the commissioners, assented to the correctness of
the defendants' claim, with the exception of the proceeds of said
eleven bales, which he claimed should go into the new account
with the others sent after Hobart's decease. The commissioners,
after hearing the parties thereon, so decided ; and struck out the
credit of the eleven bales, and added so much more to the debit
side of the account, allowing the whole. Their report thus
made was accepted by the probate court, and ordered to be
recorded, and a dividend of fifteen per cent. was ordered thereon,
with the claims of the other creditors. No appeal was taken by
the defendants from or upon any of these proceedings. The
plaintiff put in evidence the statutes and decisions of the supreme

court of the State of Vermont, as to the law relating to those proceedings. The plaintiff was appointed administrator in Massachusetts in July 1855.

The plaintiff claimed as matter of law and asked the court to rule, " 1st. That the letters and correspondence put in evidence by the defendants were insufficient to prove such a promise and agreement by the plaintiff as they had set up and alleged in their answer, and that the construction and meaning of those letters was to be determined by the court : " 2dly. That if there ever was any such promise made by the plaintiff to the defendants, it was unlawful, because he had no right, or legal authority, as administrator of the estate of Hobart, to make any such promise, or to pay any debt due from Hobart, which was not allowed by said commissioners ; that the defendants had no right to accept such payment, it being to the prejudice of other creditors ; that the appropriation contended for would be a violation of trust, and a misapplication of funds ; that such especially was the law of Vermont, which should govern this contract." The plaintiff offered other evidence and prayed for other instructions, to which it is not necessary to advert.

The court declined so to instruct the jury ; but instead thereof submitted the case to the jury, upon the single question whether the plaintiff agreed with the defendants that he would continue to run the mill, and send the goods manufactured to them to be sold, and that they should have a lien on them, and might apply the proceeds of sale to the payment of the debt of Hobart ; with instructions, that it was for the jury, and not for the court, to construe the letters and ascertain therefrom the meaning of the parties as therein expressed ; that the jury might consider the contents of the letters just as if the same expressions had been used by the writers respectively in a personal conversation with each other ; that the first four letters constituted the portion of the correspondence chiefly relied upon by the defendants to show the agreement set up by them, and were all that appeared to be very material to the determination of said question, and that the residue of the letters did not seem to be, in reference to that question, of any great importance ; but that the whole cor-

respondence, and all of the aforesaid acts and conduct of the parties in relation thereto, as far as they were of any importance, were to be taken into consideration by the jury in determining the question aforesaid submitted to them.

The jury returned a verdict for the plaintiff for the amount admitted by the defendants to be due with interest, and the plaintiff alleged exceptions.

The question as to the rejection of evidence offered by the plaintiff we have not found it necessary to consider; nor how far the defendants were estopped to set up this defence by their proceedings before the commissioners in Vermont. There are questions that preceded these, and upon which, it is plain, the case must always hinge.

The plaintiff sues as administrator of the estate of Hobart in this commonwealth for the proceeds of sales, effected by the defendants, of goods which were of the assets of that estate, which constituted the fund which the law appropriates to the payment of the debts of the deceased.

The defendants' answer to this suit is this : Admitting that they made the sales and received the proceeds, they say that the plaintiff, as administrator of the estate of Hobart, made an agreement with them that they might apply the proceeds of the sales of the goods sent to them by him since the death of his intestate to the payment of the balance due from the intestate to him at the time of his decease. They aver that such contract is contained in certain letters between the plaintiff and them, which make part of the report.

The plaintiff contends, first, that whether these letters contained such contract or not was a question of law for the court ; secondly, that, construed either upon their face by the words as written, or with the aid of the extrinsic evidence offered, they fail to show such contract or agreement as the defendants allege ; thirdly, that if the letters contained or were sufficient evidence of such contract, the plaintiff, as representing the estate of the deceased, is not concluded thereby, such contract being without authority in law and void.

The letters are offered as proof of a contract between the

administrator and the defendants. If a contract at all, they are a contract in writing. As such, the question of their interpretation — of their legal effect — was a question of law for the court. Nor is such interpretation the less a question of law, because the construction may be aided by the use of extrinsic evidence, including what may be called the practical construction put upon the contract by the conduct and acts of the parties. The court, by the aid of extrinsic evidence, may put themselves in the situation of the parties and look at the contract from their standpoint. But from whatever source light may be thrown upon the contract, what is its meaning, what promises it makes, what duties or obligation it imposes, is a question of law for the court. It is, after all, the legal reading and interpretation of what is written.

It is said that the question was one of intention, and that the intention of the parties was a question of fact and not of law. The question of intent is the question which always arises in the interpretation of a written contract. But that intention is to be found in the writing itself. If the words are unequivocal, they are the exclusive and conclusive evidence of what the parties intended. If their meaning is doubtful, you resort to extrinsic evidence, not to discover an intention outside the contract, nor to import an intention into it, but to enable you the better to read, understand and interpret what is in the contract; the contract being none the less a written contract, whose meaning is to be found in its words. This is the rule applicable not only to the interpretation and construction of simple contracts, but of deeds and wills. And the whole doctrine upon this subject has perhaps never been so clearly unfolded, and its just limits so accurately marked and defined, as in the admirable work of Vice Chancellor Wigram upon the application of extrinsic evidence to the interpretation of wills.

Nor is this rule, by which the court interprets the contract, departed from, where the extrinsic evidence is itself a matter of controversy, or where the meaning of the contract depends upon the meaning of a word as used in commerce or the arts, or is affected by a well settled and well known commercial usage.

If the use of the word in commerce or art, or the usage, is settled or agreed upon, the question of the interpretation of the contract is still exclusively with the court. But where the meaning of the word as used in commerce or art is matter of controversy, that meaning is to be found and settled as matter of fact by the jury. It may be found by special verdict, and then in the light of such finding the court interprets the contract; or the case may go to the jury as a mixed question of law and fact, under instructions from the court, that if they find the meaning of the word to be so and so, then the construction and effect of the contract are one way, if otherwise, another; that is to say, the fact being found by the jury, the court instructs the jury as to the legal result which flows from it. This doctrine is well stated by Lord Abinger and by Baron Parke in *Hutchison* v. *Bowker*, 5 M. & W. 540, 542.

In the case at bar, no question of the meaning of a word as used in commerce or art arose. The question was whether certain letters between the parties made out the contract upon which the defence relied. That was a question of law.

But if the court erred in submitting the question of construction to the jury, yet if the construction given to the letters by the jury was correct and such as the court itself should have given, such submission would be no ground for setting aside the verdict.

In this view, we have examined the letters upon which the defendants rely as containing the contract or agreement of the plaintiff, and we are of opinion that they entirely fail to show any such contract or agreement. The plaintiff's intestate died on the 16th of July 1852. Three days after his death the plaintiff (no administration having then been taken out) sends to the defendants eleven bales of flannels, at the same time requesting them to accept a draft which had been drawn on the day of Hobart's death. The defendants reply on the 21st of July, saying they had not accepted the draft, not knowing what course the plaintiff would take in settling the estate; but offering, if the plaintiff would draw a draft of the same date and amount, and sign it " A. Hobart's estate by A. Smith," and give the defend-

ants his written guaranty for the payment, they would accept. This took place before the appointment of an administrator. On the 22d of July the plaintiff was appointed administrator of the estate. On the same day he writes to the defendants; sends a draft of $1000 of the date of the 22d, which he requests the defendants to accept, informs them of his purpose to send all the cloths to them, and after some matters not material, says, "As to the guaranty of drafts now made, I am willing to do, so far as I can, in any form you dictate. The drafts now accepted, if not overdrawn above the goods now sent in and being sent in since the decease of Mr. Hobart, I think are safe to you, whether the estate pays or not.. Any paper you wish me to sign please send me." The defendants reply on the 24th as follows: "If you propose sending the goods you are now making to be sold on account of the estate for the payment of this and other drafts, we do not know as we want any guaranty from you."

To find in this language an agreement to have the goods sent in after the decease of the plaintiff's intestate applied in discharge of the balance due from the deceased at the time of his death, we must understand the words "the drafts now accepted," and "the goods now sent in," as meaning drafts which have been heretofore accepted and goods heretofore sent in, that is, during the lifetime of Hobart. But this is neither the necessary nor the plain and obvious meaning of the words. The plaintiff had forwarded a draft, at the same time remitting goods. The defendants had refused to accept the draft without a written guaranty from Smith, and without a modification in the form of the draft. The plaintiff makes the modification in form and a change of the date, sends the draft, and requests their acceptance, informing them of his intention to send all the cloth to them. Then as to the guaranty of drafts now made, he says: "I am willing to do, so far as I can, in any form you dictate. The drafts now accepted, if not overdrawn above the goods now sent in and being sent in since the decease of Mr. Hobart, I think are safe to you, whether the estate pays or not." What was the guaranty the defendants had requested? Of the drafts

made by Hobart in his lifetime ? Not at all; but of his draft of $1000, and it is as to this matter the plaintiff says " The drafts now accepted, I think, are safe to you, whether the estate pays or not." Even suppose that the words referred to and included the drafts made by the deceased, the words of the plaintiff are but an expression of his opinion as to the safety of the defendants. There are no words of stipulation or agreement. But looking at these words in the letter of July 22d with reference to the subject matter of the letter to which this is a reply, and to the answer of the defendants, we think it quite clear that they relate only to drafts made and goods sent after the decease of Hobart. And the plaintiff says in effect that the defendants do not need security for the drafts accepted, if not overdrawn above the goods now sent, because they would be safe whether the estate pays or not, that is, safe upon the security of the goods sent.

This construction is confirmed, if it needed confirmation, by the subsequent correspondence between the parties. And it is the practical one put upon the letters by the defendants in presenting their claim to the commissioners in Vermont. They did not then regard the claim as paid.

But if the true construction of the agreement were that given to it by the jury, we are all of opinion that the administrator had no authority in law to make such contract, and that if made it is no answer to the action.

As a question under the law of this commonwealth, this is plain. The assets of the estate are the fund the law appropriates to the payment of the debts of the deceased, the personal property being the fund primarily liable. If there is not estate enough to pay the debts in full, they are to be proportionably paid. In such event the estate is declared insolvent and the administrator can only pay such debts as are duly proved against the estate before commissioners appointed by the probate court, or, on appeal to a court of common law, before such court. He is not bound to pay at all within a year after he takes administration, that he may have full opportunity to ascertain the condition of the estate before he proceeds to make

payments. And so rigidly are the rule and policy adhered to, that it was early held that where a creditor was paid in full before the expiration of the year, and the estate proved insolvent, the administrator might recover of the creditor so paid the amount received over the dividend finally ordered by the probate court. *Walker* v. *Hill,* 17 Mass. 380.

If the amount due had been therefore actually paid to the defendants, the plaintiff could recover it back. It is scarcely necessary to say he cannot make a valid executory agreement, by which the property of the deceased shall be applied to the payment in full of such debt.

The only difference between the law of Vermont and our own is, we understand, that the law of Vermont pursues as to all estates of deceased persons the course our law prescribes as to insolvent estates of persons deceased, so that the administrator is authorized to pay only such debts as have been allowed by the commissioners or upon appeal from them by the courts of law. Under whichever law, therefore, we view this contract, it was void. The court should have so ruled.

The exceptions must therefore be sustained and a

*New trial granted.*

*A. A. Ranney,* for the plaintiff, to the point that the contract relied upon, being in writing, must be construed by the court, cited 2 Parsons on Con. 4 ; *Turner* v. *Yates,* 16 How. 14 ; *Fowle* v. *Bigelow,* 10 Mass. 379 ; *Eaton* v. *Smith,* 20 Pick. 150 ; *Drew* v. *Towle,* 10 Foster, 531 ; *Hutchison* v. *Bowker,* 5 M. & W. 535 ; *Begg* v. *Forbes,* 30 Eng. Law & Eq. 508 ; *Key* v. *Cotesworth,* 7 Exch. 595 ; and to the point that the administrators had no power to make such a contract, *Doe* v. *McFarland,* 9 Cranch, 151 ; *Goodwin* v. *Jones,* 3 Mass. 514 ; *Borden* v. *Borden,* 5 Mass. 67 ; *Stevens* v. *Gaylord,* 11 Mass. 256 ; *Davis* v. *Estey,* 8 Pick. 475 ; *Rand* v. *Hubbard,* 4 Met. 252 ; *Hutchins* v. *State Bank,* 12 Met. 421 ; *Pond* v. *Makepeace,* 2 Met. 114 ; *Thompson* v. *Wilson,* 2 N. H. 291 ; Story Confl. §§ 358, 359, 513, 514, 517, 519 ; 2 Kent Com. (6th ed.) 431–434 & note ; *Vaughn* v. *Barret,* 5 Verm. 333 ; *Bullock* v *Rogers,* 16 Verm. 294 ; *Abbott* v *Coburn,* 28 Verm. 663

*R. Choate & G. H. Preston,* for the defendants, to the point that the question what the contract was was rightly submitted to the jury, cited 1 Greenl. Ev. § 277, note; 2 Greenl. Ev. §§ 189, 442; 2 Phil. Ev. (3d ed.) 516; 1 Stark. Ev. (1st Amer. ed.) 429; *Hutchison* v. *Bowker,* 5 M. & W. 535; *Lloyd* v. *Maund,* 2 T. R. 762; *Smith* v. *Whiting,* 12 Mass. 6; *Goddard* v. *Pratt,* 16 Pick. 424; *Burnham* v. *Allen,* 1 Gray, 499; *Brown* v. *M' Gran,* 14 Pet. 479; *Elting* v. *Bank of United States,* 11 Wheat. 59; *Turner* v. *Yates,* 16 How. 14; *Jennings* v. *Sherwood,* 8 Conn. 127; *Sidwell* v. *Roberts,* 1 Pennsyl. 386 & cases cited; and to the point that administrators had the power to make such a contract, 1 Williams on Executors, 539, 796, 798, 802, 886; 2 Williams on Executors, 1526–1529; Toller on Executors, 487; *Whale* v. *Booth,* 4 T. R. 625, note; *Marshall* v. *Broadhurst,* 1 Cr. & Jerv. 405; *Edwards* v. *Grace,* 2 M. & W. 190; *Garrett* v. *Noble,* 6 Sim. 504; *Sterndale* v. *Hankinson,* 1 Sim. 393; *Goodwin* v. *Jones,* 3 Mass. 518; *Dickinson* v. *Dutcher,* Brayt. 104.