## BANK OF OZARK, Appellant, v. EMERY HANKS, Respondent.

### Springfield Court of Appeals, February 7, 1910.

1. **BILLS AND NOTES: Negotiable Instrument Law: Failure of Consideration: Holder in Due Course: Burden of Proof: Instruction.** Under the provisions of the Negotiable Instrument Law, sections 52 and 59, where the maker of a note shows that it was without consideration, the burden of evidence was on the purchaser of the note to show that he took the same in good faith and for value, and without any notice of infirmity in the instrument or of defect in the title of the person who negotiated it. An instruction declaring this law, approved.

2. ———: **Innocent Purchaser: Notice of Fraud.** Where the evidence shows that the purchaser of notes had sufficient notice to put him on guard as to the fraudulent scheme under which they were procured from the maker, and was therefore duly warned not to give any aid, directly or indirectly, to the swindle, the jury was justified in finding that he was not an innocent purchaser.

3. ———: ———: **Caveat Emptor.** The law has shown its consideration for the honest purchaser of negotiable paper, and has surrounded *bona fide* purchasers with every reasonable safeguard; but the legal maxim, *caveat emptor* applies as well to purchasers of negotiable paper as to the purchaser of any other species of property.

4. CONTRACTS: Power of Attorney: Against Public Policy. A power of attorney appointing a party managing agent to sell a patented article, and authorizing him to appoint other managing agents on the same terms and furnish them with similar contracts to appoint yet other managing agents in an endless chain, is contrary to public policy and void.

5. ———: Construction: Subsequent Acts of Parties to Show Meaning. The subsequent acts of the parties under a contract, to show what construction the parties themselves put on the contract may be considered in case the meaning is doubtful.

Appeal from Webster Circuit Court.—*Hon. Argus Cox,* Judge.

AFFIRMED.

*G. A. Watson* and *S. E. Bronson* for appellant.

(1) The court erred in refusing plaintiff peremptory instruction, for the reason that the testimony of the officials of the plaintiff bank that it had no notice of any infirmity of title, or of fraud in the procurement of the notes sued on, but purchased them for value, before maturity, in good faith, was not rebutted by any evidence on the part of defendant fixing such notice on the part of appellant bank. Laws of Missouri, 1905, 250; Kuch v. Cornett, 79 Mo. App. 577; Poindexter v. McDowell, 110 Mo. App. 233. (2) The court erred in giving, of its own motion, instruction number four, holding as a matter of law that the power of attorney is void as against public policy and rendered the notes fraudulent *ipso facto.* Higginbotham v. McGready, 183 Mo. 96; Foundry Co. v. Heskett, 125 Mo. 516. (3) The court erred in giving instruction number six, which casts upon plaintiff the burden of proving want of notice "of the fraud by which Lowthrop obtained said notes." Hamilton v. Marks, 63 Mo. 167; Mayes v. Robinson, 93 Mo. 122; Donovan v. Fox, 121 Mo. 247; Keim v. Vitt, 167 Mo. 399; Bank v. Tinsley, 11 Mo. App. 502; Carson v. Porter, 22 Mo. App. 184; Bank v. Stanley, 46 Mo. App. 448; Leedom v. Furniture Co., 38 Mo. App.

435; Bank v. Pipkin, 66 Mo. 597; Bank v. Hainline, 67 Mo. App. 483; Jennings v. Todd, 118 Mo. 303; Campbell v. Hoff, 129 Mo. 324; 1 Daniel, Neg. Inst. (3 Ed.), sec. 819.

*Len Walker, Addison Brown, G. P. Hays, M. Selph* and *J. P. McCammon* for respondent.

(1)   Knowledge of the cashier is imparted to the bank.   Where a transaction on behalf of a corporation is entrusted to the agent alone, the knowledge of the agent is imparted to the corporation.   Bank v. Davis, 2 Hill 451; Bank v. Milford, 36 Conn. 93; Bank v. Blake, 60 Fed. 78; Bank v. Loyd, 89 Mo. App. 262; 2 Cook, Corp. (4 Ed.), 727; 1 Beach, Priv. Corp. (1891), sec. 185; At. Mills v. Orch Mills, 147 Mass. 268, 17 N. E. 501; Bank v. Bank, 10 Gray 532; Skinner v. Bank, 4 Allen 290; Bank v. Canal Co., 4 Paige, ch. 127; Carroll v. Railroad, 14 Mo. App. 498; Bank v. Schawnburg, 38 Mo. 228; Hayward v. Insurance Co., 52 Mo. 181; State ex rel. v. Kauffman, 51 Mo. App. 257; Chouteau v. Allen, 70 Mo. 341; Trust Co. v. Insurance Co., 79 Mo. App. 368; Johnson v. Bldg. Co., 23 Mo. App. 552; Wheeler v. Stockyards Co., 66 Mo. App. 272; Stonecutter Co. v. Myers, 64 Mo. App. 533; Leonard v. Latimer, 67 Mo. App. 138; Latimer v. Loan Co., 78 Mo. App. 463.   (2) It may be true in this case that the plaintiff bought before maturity for value and without notice of any defense, and yet he may not be a purchaser in good faith. He may, when he bought, have had knowledge of facts which excited in his mind such suspicions as to the paper that he had feared to make an investigation lest it would disclose a defense, and therefore he carefully shut his eyes and bought in the dark.   In such case he would not be a purchaser in good faith.   Knowlton v. Shultz, 71 N. W. 550; Mee v. Carlson, 117 N. W. 1033; Walters v. Rock, 115 N. W. 511; Neg. Inst. Act., sec. 59; Henry v. Sneed, 99 Mo. 407; Johnson v. McMurray, 72 Mo. 278; Brown v. Hoffelmeyer, 74 Mo. App. 391; Davis v. Seeley, 38 N. W. 901.

STATEMENT.—This was an action by the Bank of Ozark, appellant, as assignee without recourse on two promissory notes, each for one hundred and forty-four dollars. The case was commenced in Christian county, but on change of venue was sent to Webster county, where on trial the respondent obtained judgment, and the case is here on appeal.

The facts out of which this action arose are substantially as follows: Sometime in April, 1906, Mark Lowthorp and W. F. Payne arrived at the city of Ozark, strangers, ostensibly for the purpose of selling a patent window-sash lock. They traveled over the country, making themselves agreeable to the well-to-do farmers, staying for dinner and putting up window-sash locks. They represented that their business was a profitable one and that they were making from four to ten dollars a day from the sale of these locks; they exhibited rolls of money and a bank book showing large deposits in the Bank of Ozark, but in which, during the three months he was there, Lowthorp only deposited something less than one hundred dollars. They placed locks on public buildings, mostly on trial, to be returned if called for, and most of which were never called for or returned. They represented that they intended to make Ozark a distributing center for their wares and that they had already arranged with Adams and Taylor, the cashier and assistant cashier of the plaintiff bank, to take charge of their general office. They stated that in such business they would need a large number of managing agents to have charge of the salesmen, look after supplies, and so forth. By means of their industry, quite an interest was aroused in the business by June 1st, at which time they brought on C. S. Lowthorp and one Fox to assist in gathering in their ripening harvest, Lowthorp having an interest as owner in the patent on the lock. In the meantime, they had taken pains to have the plaintiff bank write to Hope, Arkansas, procuring letters concerning the character of C. S. Lowthorp.

142 App—8

The plan on which the scheme was to be operated was that each of the persons selected as managing agent was required to buy a so-called "contract," for the price of two hundred and eighty-eight dollars; the price, however, was not made offensively prominent, and from some customers was altogether concealed. When a managing agent obtained a "contract," he was furnished with a book of forty-eight coupons of six dollars each. Each of these coupons was good for an order for locks in any county in the United States. He was also given a power of attorney to appoint other managing agents on the same terms and furnish them with similar "contracts" and power of attorney to appoint yet other managing agents, giving them the same power of attorney. Anyone making a sale of a "contract" was to receive one-half the proceeds, and they had placed all the counties in the United States at the same price. They made a contract with the plaintiff bank for it to collect for such sales as might be made by their managing agents, and referred all persons to whom they wished to sell contracts to Adams and Taylor, and all persons who made inquiry of Adams and Taylor were informed by them that C. S. Lowthorp came highly recommended, saying to one victim—who had a stormy scene with Fox and who was talking with Lowthorp in plaintiff bank— that they (Adams and Taylor) had wired to Arkansas, and according to their knowledge, these men were all right. Several days before the plaintiff bank bought any of the notes, Adams and Taylor were shown the "contract," power of attorney, and so forth, and represented that they had bought a "contract."

Defendant, when he bought a "contract," was just of age and this was his commencement in business. He was approached while at work on his father's farm by Mark Lowthorp, who, on the evening of the first day of their acquaintance, took him to town to supper and then drove him home, some four or five miles. Lowthorp then kept the acquaintance warm, representing to

him the great profits of the business, showing rolls of money—the proceeds of sales of sashlocks—and further representing that the cashier of the plaintiff bank was to take charge of the business. The latter part of June was set as the rounding-up time of the victims in Christian county, all the "contracts" they had sold taking effect on the same day, June 30th. On the 23d of June, defendant after having supper with one of the Lowthorps, was taken to their room in the hotel where he was induced to take a "contract." They told him that he would not be out a cent and read the contract they desired him to sign, and he signed what he supposed was such contract, but what was, in reality, the notes in suit. During the night, he became suspicious that all was not right. He went back to Ozark in the morning and asked them if he had signed notes. He was informed that he had and that his notes were in the bank and not to say anything about it, but told him they would get the notes back from the bank.

The Lowthorp crowd left Ozark about July 1st and none of them ever returned except C. S. Lowthorp, who came back accompanied by the sheriff. The "contract" of Adams and Taylor was taken on the 25th day of June, as shown by plaintiff's evidence; but Adams and Taylor, the evidence further shows, had seen the "contract" and knew its terms about the 23d of that month. The evidence also went to show that a number of persons in the county had bought "contracts" and given notes under the supposition that they had signed "contracts," and had gone to the bank and reported the facts, notifying the bank that the scheme was a fraud and notified them that they had signed the contracts, but that Lowthorp and company had substituted notes in place of "contracts," to which the cashiers Adams and Taylor replied that it was undoubtedly genuine and undoubtedly honest. The evidence showed also that Adams and Taylor gave a witness by the name of Walker directions as to how to work the scheme gener-

ally.   They said to him to sell the locks if he could, and if he could not sell at a house to leave them and tell the people that he could call on a certain day and get them; that at the proper time, Lowthorp was to come around and close the "contracts;" that the object in putting up the locks and leaving them was to get the people to see them and to get the locks scattered over the country so as to give the appearance that people had bought them and that a great deal of business was being done, but to get the people to buy "contracts;" that the "contracts" were where the money was made.

NIXON, P. J.—(after stating the facts.)—I.   The jury was undoubtedly justified in finding that the notes were conceived and brought forth in fraud, and that Lowthorp and company were an organized gang of professional swindlers, traversing the country to entrap the unwary by a fraudulent sashlock scheme and by specious and fraudulent representations, obtaining promissory notes for the purpose of negotiating them, and then moving on to other counties to reap another harvest from the unsuspecting people.

Our Negotiable Instruments Act (Session Laws, 1905, p. 243) provides: "Sec. 59.   Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course." A "holder in due course" is defined in section 52 of the same act to be a holder who has taken the instrument under the following conditions:   "(1)   That it is complete and regular on its face;   (2)   that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;   (3)   that he took it in good faith and for value;   (4) that at the time it was negotiated to him he had no

notice of any infirmity in the instrument or defect in the title of the person negotiating it."

It will be seen from these provisions of the law that when the respondent had shown that his notes were procured by fraudulent representations and were without consideration, the burden of evidence was on the appellant bank to show that it took the same in good faith and for value and without any notice of infirmity in the instrument or defect in the title of the person who negotiated it.

It is assigned as error that the trial court erred in failing to state the above law correctly in giving the following instruction as to the burden of evidence:

"If the jury believe and find from the evidence that the notes in suit were obtained by fraud on the part of C. S. Lowthorp and his agents, then the burden is on the plaintiff and it must show by greater weight of the testimony that it bought said notes in good faith, in due course of business, without notice of the fraud by which Lowthorp obtained said notes, and if the plaintiff has not made such proof, then your verdict must be for the defendant."

This instruction was a full compliance with the Negotiable Instruments Law. Numerous decisions from this and other jurisdictions have been cited to sustain the proposition of law thus stated, but the language of the law in relation to negotiable instruments is so clear and unambiguous that it speaks for itself and authorities are unnecessary. It may be added in this connection that the weight of credibility of this evidence was a question for the determination of the jury; that there was substantial evidence to put the question to the jury, and the Constitution has forbidden us to enter their sacred precincts. There was substantial evidence to show that plaintiff had actual knowledge of the fraudulent scheme and fraudulent practices by which notes were being procured by Lowthorp and his conspirators.

II.     Further complaint is made by appellant against instruction numbered four given by the court, which is as follows:

"If you believe that the consideration for the notes sued on was the purchase by defendant of the right to sell the safety sashlock in the county of Texas, State of Missouri, and also the right on the part of defendant to appoint other agents with the same power which he possessed, as shown by the power of attorney offered in evidence, then the question as to whether or not the transaction was fraudulent would depend upon what was the real consideration for the execution of the notes. If the right to sell the safety sashlocks in the county of Texas, State of Missouri, constituted any substantial part of the consideration, then the transaction was not fraudulent and your verdict should be for the plaintiff.

"The power of attorney in evidence which was given defendant at the time of the execution of the notes by him is void as against public policy, and if you believe that such power of attorney was the real consideration for the execution of the notes, and the right to sell the sashlocks in Texas county, Missouri, was only an incident and given only for the purpose of giving the transaction the color of legality and not as a substantial part of the consideration, then the entire transaction in the execution of the notes was fraudulent, and whether plaintiff can recover or not in this case will depend upon whether or not it purchased the notes for value, before maturity, and without notice of the fraud in their execution.   .   .   ."

The trial court correctly declared that the power of attorney to appoint other managing agents on the same terms and furnish them with similar contracts to appoint yet other managing agents in an endless chain to be void as contrary to public policy. [Twentieth Century Co., v. Quilling (Wis.), 110 N. W. 174.] The evidence as shown by the contracts themselves amply justified the court in giving this instruction. And in

ascertaining the meaning of these contracts, the subsequent acts of the parties tending to show what construction the parties themselves put on these contracts may be considered in case their meaning is doubtful. [St. Louis Gaslight Co. v. St. Louis, 46 Mo. 121; Ellis v. Harrison, 104 Mo. 270, 16 S. W. 198.]

The law has shown its consideration for the honest purchaser of negotiable paper and has surrounded *bona fide* purchasers with every reasonable safeguard. The procuring of negotiable paper by fraudulent practices— as in the present case—has been carried on systematically by many swindling schemes. It is, of course, a part of the "game" to market their fraudulent paper, for without such an opportunity, the scheme could not be carried into consummation. The legal maxim, *caveat emptor*, applies as well to purchasers of negotiable paper as to the purchaser of any other species of property.

Under all the circumstances in this case, the jury was well warranted in believing that the officers of the plaintiff bank had at least sufficient notice to put them on guard as to the fraudulent scheme and they were therefore duly warned not to give any aid, directly or indirectly, to the swindle that was being perpetrated on their neighbors and customers. The law will not stamp its approval upon such transactions, offensive with the odor of corruption and foul with the taint of fraud.

The judgment was so manifestly for the right party that it should not be disturbed. [State ex rel. v. Jones, 131 Mo. 194, 33 S. W. 23; Cass County v. Bank of Harrisonville, 157 Mo. 133, 57 S. W. 736; S. Albert Grocery Co. v. Grossman, 100 Mo. App. 338, 73 S. W. 292; Carmody v. Hanick, 99 Mo. App. 357, 73 S. W. 344.] The judgment is accordingly affirmed. *Gray, J.,* concurs. *Cox, J.,* having presided as judge in the trial court, did not sit.