BANK OF OZARK, Appellant, v. ED. TUTTLE, Respondent.

Springfield Court of Appeals, May 2, 1910.

1. **BILLS AND NOTES: Fraud: Innocent Purchaser.** Defendant's signature was obtained to the notes sued on by the fraudulent representations of a gang of swindlers. Plaintiff claimed to be an innocent purchaser. The evidence examined and held to show that plaintiff had sufficient notice to put it on guard of the fraudulent scheme and failure of consideration before the purchase of the notes, and that the jury was warranted in so finding.

2. ———: ———: ———: **Caveat Emptor.** The law has shown its consideration for the honest purchaser of negotiable paper and surrounded bona fide purchasers with every reasonable safeguard, but the legal maxim, *caveat emptor*, applies as well to the purchaser of negotiable paper as to the purchaser of any other species of property.

3. **EVIDENCE: Fraud: Cumulative Evidence: Subsequent Transactions.** A gang of swindlers operating an "endless chain" contract scheme fraudulently obtained defendant's signature to the notes sued on. The evidence showed that the officers of plaintiff bank had full notice of the nature of the fraudulent transactions before purchasing these notes. Evidence was also introduced of similar fraudulent operations of the gang in another county subsequent to the purchase of the notes, at which time one of the officers of the bank was working with the swindlers. *Held*, that the evidence of the transactions subsequent to the sale of the notes with or without the knowledge of plaintiff was incompetent; but, as the evidence was cumulative, and plaintiff's previous knowledge was sufficiently shown, the error of admitting the evidence of the subsequent transactions was harmless.

4. ———: **Cumulative Evidence: Harmless Error.** The general rule is that a judgment will not be reversed on account of the admission or exclusion of evidence merely cumulative.

Appeal from Christian Circuit Court.—*Hon. John T. Moore*, Judge.

AFFIRMED.

*Len Walker, A. Brown, G. P. Hays* and *J. P. Mc-Cammon* for respondent.

(1) The contract, the consideration for defendant's notes, was an illegal and void contract. Greenhood on Pub. Pol., 1, 152; Champion Fdy. Co. v. Heskett, 125 Mo. App. 516, 102 S. W. 1050; Century Co. v. Quilling, 110 N. W. 174; Schmuckle v. Waters, 25 N. E. 281; Merrill v. Packer, 45 N. W. (Mich.), 1076; McNamara v. Gargett, 36 N. W. (Ia.) 218; Davis v. Seeley, 38 N. W. 901; Hubbard v. Greiburger, 94 N. W. 727; Sprague v. Rooney, 104 Mo. 358; McDearmott v. Sedgwick, 140 Mo. 181; Keim v. Vette, 167 Mo. 402; Attaway v. Bank, 93 Mo. 485. (2) The burden of proof of good faith was on plaintiff. Henry v. Sneed, 99 Mo. 422; Johnson v. McMurray, 72 Mo. 278; Hahn v. Bradley, 92 Mo. App. 405; Bank v. Hammond, 104 Mo. App. 409; Stewart v. Andes, 110 Mo. App. 247, 84 S. W. 1134; Brown v. Hoffelmeyer, 74 Mo. App. 385; Gaus v. Weisenberger, 66 Mo. App. 114; Campbell v. Hoff, 129 Mo. 324. (3) The evidence admitted was proper, both to show the fraud in the inception of the contract, and as tending to show notice to the bank and a lack of good faith. Edwards v. Thomas, 66 Mo. 483; Brown v. Hoffelmeyer, 74 Mo. App. 391; Davis v. Seeley, 38 N. W. 904; Manheimer v. Harrington, 20 Mo. App. 301; Davis v. Vories, 141 Mo. 241; Wood v. U. S., 16 Pet. 342; Swinney v. Patterson, 62 Pac. 1; State v. Beaucleigh, 92 Mo. 490.

*S. E. Bronson* and *G. A. Watson* for appellant.

(1) The demurrer to the defendant's evidence offered at the close of the testimony should have been sustained. Laws of Mo. 1905, 250; Bank v. Hainline, 67 Mo. App. 483; Hoster v. Lange, 80 Mo. App. 238; Mosby v. Commission Co., 91 Mo. App. 504; Bank v. Hammond, 104 Mo. App. 403; Poindexter v. McDowell, 110 Mo. App. 236. (2) The bank had no notice of the defect of title, if any, in C. S. Lowthrop and this is so, even if the evi-

dence showed (which it did not) that Adams, the assistant cashier, had notice acquired by him through private transactions, beyond scope of his official duties.   Bank v. Froman, 129 Mo. 437; Benton v. Bank, 122 Mo. 332; Bank v. Fitze, 76 Mo. App. 356; Penfield Inv. Co. v. Bruce, 111 S. W. 888.

STATEMENT.—This was an action by the Bank of Ozark, appellant, as assignee without recourse, on two promissory notes, each for $144.   There was a judgment for defendant in the circuit court and the plaintiff has appealed.

The facts out of which this action arose are substantially as follows:  Some time in April, 1906, Mark Lowthorp and W. F. Payne arrived in the city of Ozark, strangers, ostensibly for the purpose of selling a patent window-sash lock.  They traveled over the country, making themselves agreeable to well-to-do farmers, staying for dinner and putting up window-sash locks.   They represented that their business was a profitable one, and that they were making from four to ten dollars a day from the sale of these locks; they exhibited rolls of money and a bank book showing large deposits in the Bank of Ozark, but in which, during the three months he was there, Lowthorp only deposited something less than one hundred dollars.   They placed locks on public buildings, mostly on trial, to be returned if called for, and most of which were never called for or returned. They represented that they intended to make Ozark a distributing center for their wares, and that they had already arranged with Adams and Taylor, the cashier and assistant cashier of the plaintiff bank, to take charge of their general office.  They stated that in such business they would need a large number of managing agents to have charge of the salesmen, look after supplies, and so forth.   By means of their industry, quite an interest was aroused in the business by June 1st, at which time they brought on C. S. Lowthorp and one Fox to assist in gath-

ering in their ripening harvest, Lowthorp having an interest as owner in the patent on the lock. In the meantime, they had taken pains to have the plaintiff bank write to Hope, Ark., procuring letters concerning the character of C. S. Lowthorp. The plan on which the scheme was to be operated was that each of the persons selected as managing agent was required to buy a so-called "contract," for the price of $288; the price, however, was not made offensively prominent, and from some customers was altogether concealed. When a managing agent obtained a "contract," he was furnished with a book of forty-eight coupons of six dollars each. Each of these coupons was good for an order for locks in any county in the United States. He was also given a power of attorney to appoint other managing agents on the same terms and furnish them with similar "contracts" and power of attorney to appoint yet other managing agents, giving them the same power of attorney. Any one making a sale of a "contract" was to receive one-half of the proceeds, and they had placed all the counties in the United States at the same price. They made a contract with the plaintiff bank for it to collect for such sales as might be made by their managing agents, and referred all persons to whom they wished to sell contracts to Adams and Taylor, and all persons who made inquiry of Adams and Taylor were informed by them that C. S. Lowthorp came highly recommended, saying to one victim—who had a stormy scene with Fox, and who was talking with Lowthorp in plaintiff bank—that they (Adams and Taylor) had wired to Arkansas, and, according to their knowledge, these men were all right. Several days before the plaintiff bank bought any of the notes, Adams and Taylor were shown the contract, power of attorney, and so forth, and represented that they had bought a "contract." It was shown that during June, Taylor, while in and out of the bank every day, was not on duty, and that Adams had the entire management of

the bank, merely reporting his action to the board at the end of each month.

From the time of the beginning of their work, Mark Lowthorp had been stopping at defendant's house, taking meals and leaving unsold locks there, showing silver loose in his buggy, telling him of their desire to appoint him as a managing agent to keep supplies, and so forth. On June 23d, Saturday evening, they all got the defendant into a room to "close up." He is an old man, had been subject to "dizzy spells" when hot, and the evening being very warm, he states that he grew hot and dizzy. They stood between him and the door, some of them fanning him, and they asked him to sign what they represented and he believed to be a "receipt" of contract —two papers. His eyesight was bad and he was unable to see without his glasses, which were at home. But they showed him where to sign and he signed the papers, supposing them to be as represented, and not seeing anything which looked like a promissory note. He had been told that the book of coupons given him might be delivered to Adams and Taylor, or all coupons not used in ordering locks, and he would be credited therefor. His notes were sold to the bank the following Monday, June 25th. On that day, having read his "contract" and the receipt thereon and becoming dissatisfied, he went back and wanted to rescind and was told that his papers had been sent to the company making the locks in Illinois. It was also shown in evidence that on June 22d or 23d, one Hammond, who had bought a "contract," had gone to the bank with Lowthorp, claiming to have been defrauded by him, and that Adams told Hammond they were all right. That one Hartley, on Saturday, June 23d, had also gone to the bank and talked with Adams, he being suspicious also, and Adams satisfied him it was all right. That one Billingsley, who had made his notes on June 22d (Friday), had gone to Ozark, not being able to sleep because of his suspicions, and told Taylor on the 23d or 24th of June that he had heard it was a fraud and

asked if his note had been bought by the bank; that he was told it had not and he then told Taylor not to buy the note, that he would not pay it, at the time calling witnesses to the warning given Taylor, and that Taylor said they would not buy it. And Taylor testified that he told Adams not to buy it and they did not.

On the first day of July the Lowthorps and their agents left Ozark and went to Marshfield, Taylor going with them. The scheme having been exposed by an Ozark newspaper, they were compelled to go elsewhere, and about the middle of July went to Linneus, Missouri, where the same program as at Ozark was followed. Several depositions of persons residing at or near Linneus were introduced by defendant, showing that the same tactics were used at Linneus as at Ozark.

When defendant's first note became due, he was notified that it was held by the plaintiff bank, and upon his refusal to pay, this suit was instituted at the same time as others on similar notes.

NIXON, P. J.—Attention is called to the fact that this is an action on notes procured by Lowthorp and company under circumstances disclosed in the case of Bank of Ozark v. Hanks, 142 Mo. App. 110, 125 S. W. 221, and this case is practically a companion of that case. It will be seen on comparison of the evidence that the two cases are almost identical; that Lowthorp and company were a band of professional swindlers, traversing the country to entrap the unwary by a fraudulent sash lock scheme, and, by specious and fraudulent representations, obtaining promissory notes for the purpose of negotiating them, and then moving on to other counties to reap another harvest from the unsuspecting people. The first history of the operation of this band of swindlers in Missouri commenced in Christian county. After completing their operations in that county, they sought new territory in Webster county, but having become alarmed at notice given of their operations, they moved on to

Linn county, taking Taylor with them. While in Christian county, they obtained the notes sued on in this action.

The defendant, Ed. Tuttle, was a resident of Christian county, and the Lowthorp gang by their schemes succeeded in securing his signature to what they represented and he believed to be a receipt of contract—two papers—and the evidence tended to show that he executed the papers believing them to be such contracts. That at the time he could not see without glasses and was feeling dizzy. The notes were sold to the plaintiff bank the following Monday, June 25th. It is shown that there was an entire failure of consideration for these notes and that they were obtained by fraudulent representations.

The legal questions involved upon the evidence presented in this record are entirely identical with those in the Hanks case and it is wholly unnecessary to again discuss them; they are simply referred to and adopted as a part of this opinion.

There is, however, an additional question not previously presented or considered in the Hanks case. At the trial of the case, defendant offered in evidence the depositions of Jonathan Knight, S. L. McGarraugh and others as to what took place in the sale of sash locks and the carrying out of the same fraudulent scheme in Webster and Linn counties after the time when the plaintiff bank bought the notes in question. To the offer of this evidence, the appellant duly objected but the evidence was received and read to the jury. The evidence was only offered for one purpose and that was to show that the bank at the time it purchased the notes had notice of the consideration for which the notes were given and the circumstances under which they were procured. This evidence as to what Lowthorp and company did with or without the knowledge of the plaintiff bank subsequent to the purchase of the notes was certainly incompetent. But it

does not thence follow from the admission of such in-competent evidenct that the judgment should be reversed. The assistant cashier of the appellant bank himself tes-tified that as the agent of the bank he purchased the notes of C. S. Lowthorp paying therefor $265, in cash, a discount of eight per cent. on the two notes; that the notes were indorsed without recourse and that Lowthorp when asked to indorse the notes refused to do so; the assistant cashier also stated that he had only bought one note before for the bank from strangers. It also appears that at least one citizen had called at the bank two days before the purchase of these notes and notified the offi-cers of the bank not to purchase his notes for the reason that he believed the whole thing was a swindle. It fur-ther appears that Taylor and Adams had purchased one of these contracts and intended to operate the scheme themselves. All this appears in so satisfactory a way that there could be no question as to the ample notice that the bank had of the consideration for these notes. The tendency of the evidence offered by the respondent in the form of depositions was to show that after Taylor and Adams had purchased a contract, Taylor went through other counties with Lowthorp and company in the sale of these contracts. As will be seen, such testi-mony only tended to show operations of the gang similar to their operations in Christian county, and showing that they continued the same swindling scheme in Webster and Linn counties. This evidence was entirely cumu-lative in its nature, and the general rule is that a judg-ment will not be reversed on account of the admission or exclusion of evidence merely cumulative. [Martin v. Block, 24 Mo. App. 60; Young v. Hudson, 99 Mo. 102, 12 S. W. 632; Miller v. Miller, 13 Mo. App. 591; Nelson v. Wallace, 57 Mo. App. 397; Gidionsen v. The Union Depot Ry. Co., 129 Mo. 392, 31 S. W. 800.] Especially should this rule be applied to cases like the present where the evidence is substantially uncontradicted that the bank, after its officers had full notice of the nature of the

fraudulent transactions, purchased these notes. [Leeser v. Boekhoff, 38 Mo. App. 445; Levitt v. Miller, 64 Mo. App. 147.]

The law has shown its consideration for the honest purchaser of negotiable paper and surrounded bona fide purchasers with every reasonable safeguard. The procuring of negotiable paper by fraudulent practices, as in the present case, has been carried on systematically by many swindling schemes.

It is, of course, a part of the "game" to market the fraudulent paper, for without such an opportunity, the scheme could not be carried into consummation. The legal maxim *caveat emptor* applies as well to purchasers of negotiable paper as to the purchaser of any other species of property.

Under all the circumstances in this case, the jury was well warranted in believing that the officers of the plaintiff bank had at least sufficient notice to put them on guard as to the fraudulent scheme, and they were therefore duly warned not to give any aid, directly or indirectly, to the swindle that was being perpetrated on their neighbors and customers. The law will not stamp its approval on such transactions, offensive with the odor of corruption, and foul with the taint of fraud.

In any event, where, as in this case, upon a consideration of the whole record, the judgment is so manifestly for the right party, it should be affirmed, regardless of errors occurring at the trial. [State ex rel. v. Jones, 131 Mo. 194, 33 S. W. 23; Cass County v. Bank, 157 Mo. 133, 57 S. W. 736; S. Albert Grocery Co. v. Grossman, 100 Mo. App. 338, 73 S. W. 292; Carmody v. Hanick, 99 Mo. App. 357, 73 S. W. 344; State ex rel. v. Branch, 151 Mo. 622, 52 S. W. 390; Farmers' Grist Milling Co. v. Lovell, 78 Mo. App. 320; Woody v. St. L. & S. F. R. Co., 104 Mo. App. 678, 78 S. W. 658.]

The judgment is accordingly affirmed. *Gray, J.,* concurs. *Cox, J.,* not sitting.