THE ST. LOUIS GASLIGHT COMPANY, Appellant, v. THE CITY OF ST. LOUIS, Respondent.

1. *Contracts — Latent ambiguity — In contract of doubtful meaning, construction of, as shown by continued conduct of parties, should prevail over that given by court.* — In the use of words of doubtful meaning or application, the meaning and application given by the parties who used them should prevail over an interpretation that might otherwise be given by the court. In the interpretation of contracts of this sort, regard should not be had to loose declarations, or equivocal or isolated acts; but the continuous conduct of the parties for a series of years concerning the subject-matter of the contract, and in fulfillment of its conditions — every act pointing in the same direction — is properly admissible in evidence. And the rule embraces acts subsequent to the date of the contract, and includes deeds and instruments under seal.

2. *City ordinances, designed for a city at large, apply to its enlarged boundaries.* — A city ordinance, or a city contract designed for a city at large, operates throughout its boundaries, whatever their change.

3. *St. Louis Gas Company — Contract for gas — Gas furnished St. Louis in extended limits — Estoppel.* — In suit by the St. Louis Gaslight Company against the city of St. Louis, for amount claimed as due for gas furnished defendant in its enlarged boundaries, where it appeared that without dispute, and for a long series of years, plaintiff had claimed and exercised, and been supported in, the exclusive right of occupying, under a certain contract, the new as well as old city limits, *held*, that it should be estopped from seeking to limit its operation for the purposes of the suit.

*Appeal from St. Louis Circuit Court.*

On the 9th day of January, A. D. 1846, under the provisions of the original and amended charter of the St. Louis Gaslight Company, a contract in writing was entered into between the city of St. Louis and said Gas Company, which embraced among others the following provisions:

" The party of the first part do agree with the party of the second part that they will and do, under the provisions of the twenty-sixth section of the St. Louis Gaslight Company's charter, hereby order and contract for the erection of five lamps on each square or block within that part of the city of St. Louis bounded as follows: On the east by Front street, on the west by Fourth street, on the north by Cherry street and Franklin avenue, and on the south by Myrtle street, together with an equivalent number of lamps on the west side of Fourth street, as will complete the lighting of said street from Myrtle street to Franklin avenue."

    *          *          *          *          *

" And the party of the second part do hereby agree and bind themselves and their successors to furnish, in the shortest practicable time, to the party of the first part, in addition to the lamps hereby ordered, such additional lamps as may be ordered (from time to time) by the party of the first part, six months' notice being given to the party of the second part of the required extension: *provided*, that the extension required from time to time shall net to the party of the second part, upon the cost thereof, six per cent. per annum, which is hereby guaranteed by the party of the first part, provided the cost aforesaid shall be certified to by affidavit of the president of the aforesaid Gaslight Company.

" *Second.* That the party of the second part do agree, under the twenty-sixth section of said charter, to erect and keep in repair such public lamps or burners in the streets or other public places within the city of St. Louis as are hereby contracted for and may be hereafter ordered under the provisions of said charter ; and the said party of the first part agree to pay to the said party of the second part, for the gas used and consumed by

each public lamp or burner, of an illuminating power equal to the gaslight of any other city in the Union, herein ordered by the party of the first part, and erected by the party of the second part, the sum of twenty-five dollars per annum, to be paid in quarterly payments; said lamps to be kept burning, commencing during twilight in the evening and ending at dawn of day in the morning, except when the clear moonlight renders it unnecessary; the party of the first part lighting, extinguishing, cleaning, and making such repairs, other than such as result from natural wear and tear, to said lamps, posts, or brackets herein or hereafter to be ordered: *provided*, that the sum of twenty-five dollars per annum for each lamp herein ordered shall be in full of all demands against the said party of the first part, for gas, furnishing lamps, lamp-posts or brackets, and gas pipes, and the cost of laying and erecting the same, and the interest on the cost thereof, anything in the twenty-sixth section of said charter of the St. Louis Gaslight Company to the contrary notwithstanding: *provided further*, that the city in no case shall pay to the party of the second part a sum greater than a majority of the private consumers are paying for gas.

" *Third.* The said party of the second part agree to erect one-half of the lamps herein contracted for within one year, and the remaining half within two years, from and after the first of October, 1846."      *      *      *      *      *

*      *      *      *      *      *      *

" *Fifth.* The party of the first part agree and do hereby relinquish the right to purchase the gas-works, property etc., of the Gaslight Company at the expiration of twenty years from and after the first of January, 1840, as provided by the twenty-seventh section of the charter of said company: *provided*, that in the event the said party of the first part shall decline to purchase the gas-works, property, etc., at the end of twenty-five years from and after the first of January, 1840, as is provided in the twenty-eighth section, they shall have the privilege of purchasing, as aforesaid, at the end of thirty years, from and after the first day of January, 1840, and at the period of every five years thereafter, in the manner as is provided in the twenty-seventh and

twenty-eighth sections, and upon giving notice of intention so to purchase, as is provided in section 28 of said charter." * *

*　　*　　*　　*　　*　　*

" *Eighth.* It is mutually agreed between the parties aforesaid that the second party may, at any time on or before the first of October, 1846, cancel the preceding provisions of this contract by giving notice to that effect, in writing, to the mayor: *provided,* that in such case the said second party shall, and they do, hereby bind themselves to surrender all exclusive privileges of lighting the city under their charter.

" *Ninth.* That the parties to this instrument do mutually absolve each other from the conditions contained in a former contract, dated 8th of January, 1841, in reference to the lighting of the city of St. Louis with gas: *provided, however,* that unless the said company shall go on in good faith to fulfill the terms of this contract, all penalties accruing under the former contract shall be and continue in force."

It was admitted, partly by pleadings and partly by stipulations on the trial, that the total number of lamps ordered and erected in the city limits described in the contract, and in the time therein allowed, was 263 ; also, that subsequent to the erection of the above 263 lamps, the city did from time to time order, and the Gas Company did from time to time erect, large numbers of additional lamps on other streets and in other parts of said city not embraced within the district so specified in said contract; and that the total number of lamps erected by said company and in use by the city, and for the gas used in which the city was responsible to the Gas Company, at the several dates mentioned in the petition, was as follows : during the quarter ending April 30, 1866, an aggregate of 2,095 lamps, viz: 263 lamps within the district specified in said contract, and 1,832 lamps outside of that district; during the quarter ending July 31, 1866, 263 lamps within and 1,999 lamps outside of said district — in all 2,262 lamps ; during the quarter ending October 31, 1866, 263 lamps within and 2,196 lamps outside of said district — in all 2,459 lamps.

*Glover & Shepley*, and *Krum* and *Hitchcock*, for appellant.

I. Taking the whole contract of January, 1846, together, the meaning of the words "herein ordered," used therein, is perfectly clear and unambiguous, and they should be applied only to lamps erected within the district particularly described in the beginning of the contract.

II. For evidence of a latent ambiguity to be admissible, it must be made out clearly. (Sugd. on Vend. 140; 2 Phillips on Ev. 750; Smith v. Jeffries, 15 M. & W. 561; Walpole v. Cholmondeley, 7 T. R. 138.)

III. The term "herein ordered" being perfectly clear in meaning, and without ambiguity, latent or patent, parol evidence was inadmissible to show the intention of the parties using it, either directly or indirectly. (1 Greenl. on Ev. 277–8, 295; 2 Phillips on Ev. 233–4; 2 Stark. on Ev. 563, 566; 2 Pars. on Cont. 564; Chit. on Cont. 106; Shore v. Wilson, 9 Cl. & Fin. 566 *et seq.*; Cortelyou v. Van Brundt, 2 Johns. 362; Clifton v. Walmesley, 5 T. R. 289; Meres v. Ansell, 3 Wils. 276; Allen v. Kingsbury, 16 Pick. 238; 7 Greenl. 423.)

IV. Even if the term "herein ordered" were ambiguous, as alleged, whether the ambiguity were patent or latent, the court erred in admitting evidence of the actions of the parties subsequent to the contract, to show their intention in using words contained in said contract. Such evidence is admissible only in the case of ancient deeds, grants, etc. (Sugd. on Vend. 1404; Stark. on Ev. 629; 2 Saund. Pl. and Ev. 697; Chit. on Cont. 106; Munro v. Taylor, 8 Hare, 56; Simpson v. Margitson, 11 Ad. & El., N. S., 32; Baynham v. Guy's Hospital, 3 Ves. 298; Moore v. Foley, 6 Ves. 237; Livingston v. Ten Broeck, 16 Johns. 14; Allen v. Kingsbury, 26 Pick. 228; Parsons v. Miller, 15 Wend. 561; 2 Phillips on Ev. 672 *et seq.*, and note p. 526.)

V. The words "herein" and "hereafter," throughout the second clause, are in such direct antithesis to each other that it would be impossible to give defendant's construction to "herein" without striking out "hereafter" wherever it appears in the contract. This would be to vary the contract, not to construe it,

and would be beyond all precedents. Parol evidence can in no case be allowed to take from or add tô the language of a written instrument.

VI. Parol evidence of the acts of the parties under the contract being inadmissible, and the question being upon the construction of the terms of a written instrument bared of all extraneous circumstances, it was for the court, and not for the jury, to give the meaning of the terms in question as used by the parties. (Sugd. on Vend. 141 ; 2 Pars. on Cont. 492, 556, note *b ;* Caldwell v. Dickson, 26 Mo. 61 ; Belt v. Goode, 31 Mo. 128 ; Simpson v. Margitson, 11 Ad. & El., N. S., 32 ; Eaton v. Smith, 20 Pick. 156 ; Hutchinson v. Bowker, 5 Mees. & Ed. 540 ; Browne v. Holton, 9 Ired. 327 ; Wason v. Rowe, 16 Verm. 528 ; Hitchin v. Groom, 5 C. B. 519 ; Begg v. Forbes, 30 Eng. L. & Eq. 508 ; Allen v. Kingsbury, 16 Pick. 239.

*Geo. P. Strong,* for respondent.

I. The proper construction of the language of the contract, when all its provisions are duly considered, supports the claim of the city as to its proper meaning. Such was the manifest intent of both parties as to the meaning the contract should have, and this intent is to govern in the construction of the contract. (2 Sto. on Cont., §§ 634, 636, 640, 441 *a,* 640 *b,* 657, 658 *a ;* Bell v. Bruen, 1 How. 187–8 ; Sumner v. Williams, 8 Mass. 162, 213, 214 ; Warren v. Merrifield, 8 Metc. 93, 95.)

II. Such is the construction which the parties themselves have put upon the contract by an unvarying practice of more than twenty years. The acts of the parties furnish a legitimate and often the most satisfactory mode of determining the meaning of the terms they have used in their contracts. (Chapman v. Bluck, 5 Scott, 530, 533 ; 5 Watts & Serg. 122 ; Chit. on Cont. 89 ; Warren v. Merrifield, 8 Metc. 266 ; Patterson v. Combden, 25 Mo. 13, 21, 22 ; Wilcox v. Bowles, 1 La. Ann. 230 ; Parrott v. Wickoff, *id.* 235 ; Fowle v. Bigelow, 10 Mass. 379, 392 ; Wagley v. Bayliss, 5 Taunt. 752 ; Cambridge v. Lexington, 17 Pick. 228–30 ; Livingston v. Ten Broeck, 16 Johns. 22.)

BLISS, Judge, delivered the opinion of the court.

The plaintiff complains chiefly of the instruction to the jury in relation to the construction of the contract between it and the city, and claims, first, that the language of the contract is plain and unequivocal, and not subject to the construction sought to be put upon it by the defendant; second, that it was the duty of the court to construe it, and that that duty could not be thrown upon the jury; and, third, that it was improper, in order to ascertain the meaning of the contract, to consider the subsequent acts of the parties in relation to it in order to ascertain the construction which they themselves had put upon it.

Ordinarily, when there is any uncertainty in the terms of a contract, it is the duty of the court to declare its meaning. When it is so plain that only one meaning can be attached to it, it admits of no construction, and that meaning must be enforced. To give it any other would be making, rather than interpreting, a contract. Assuming that there is sufficient doubt as to the meaning of this agreement to admit of construction, I will first consider the question whether the court was bound to construe it from its language alone, or whether the action of the parties might be inquired into in order to ascertain the construction which they put upon it for themselves; in a word, whether, in the use of words of doubtful meaning or application, the meaning and application given them by the parties who used them shall prevail over an interpretation that might be given by the court. It seems to me that the statement of the question should carry with it the proper answer. It has nothing to do with the old question of the admissibility of evidence to contradict or vary a written agreement. The law upon that matter has been too long and well settled to be subject to any doubt whatever, and the position taken by the Circuit Court in its instruction to the jury does not involve its consideration. Nor is it the same question that so often arises when evidence is offered to explain a latent ambiguity, though it has a strong analogy to it.

Our daily experience impresses us with the imperfection of common language and shows the errors into which we constantly

stumble in the use of the most important medium we possess for the communication of ideas.    Such is the indefiniteness of words and phrases in daily use, and of so many meanings and shades of meaning are they susceptible, according to their arrangement, application, figurative or provincial use, or the different ideas attached to them by different persons, or by the same persons on different occasions, that no science or special art can be taught and no mechanical occupation can be prosecuted without the precision of technical terms and phrases.    And if simple words and phrases so fail to communicate ideas with accuracy and precision, so much the more may parties to a long and complicated agreement not only fail to understand it alike, as is shown by every day's dispute, but if they agree in its meaning they may give it an interpretation differing from that which a court accustomed to greater precision of language would consider the most natural.    In a case of that kind, whose interpretation should prevail?    If the court gives one differing from that understood by the parties, it in effect makes a new agreement—the very thing most to be avoided.    If it leaves the parties to be governed by their understanding of their own language, it in effect enforces the contract as actually made.    That they should be so permitted to construe their own agreement, accords with every principle of reason and justice.

It is true that evidence of such understanding should not be entertained when the language is clear and will admit of but one interpretation, because in that case, unless there is fraud or mistake, the language used is the best possible evidence of the intention.    Nor should any regard be paid to loose declarations or equivocal or isolated acts, but the continuous conduct of the parties for a series of years concerning the subject-matter of the contract, and in fulfillment of its conditions — every act pointing in the same direction — may make their understanding as clear as by the greatest precision of language.

In Patterson v. Camden, 25 Mo. 13, certain partners published a notice of dissolution, with notice that a new firm, composed of part of the members of the old, would collect the dues and pay the debts.  The new firm drew a bill in the name of the old firm

to pay certain debts, and the court below had held that the written terms of the dissolution did not warrant the act. In view of that holding, this court declined to give a construction to the words of the notice, and said: "The practical construction of the notice given by the parties themselves, or the acts of the parties in regard to the subject-matter under the notice, may be properly looked to, properly taken into consideration, in order to ascertain what meaning the parties intended to attach to the instrument. * * * This practical construction given by the parties themselves is a proper guide to its meaning, and is of more importance than what is the abstract meaning which this court may attach to its mere phraseology."

The court quote, as authority, Whitehead v. Bank of Pittsburg, 2 Watts & Serg. 172, which is a very similar case; and a certain construction was there given by the court to the article of dissolution, because the parties themselves had by their acts given it that meaning, the judge remarking: "I know of no better mode of ascertaining this meaning than is shown, if all parties acted on a particular meaning."

In Chapman v. Bluck, 5 Scott, C. P., 515, it became material to determine whether certain correspondence between landlord and tenant was a lease or only an agreement to lease; and the court not only considered the correspondence making the alleged demise, but also subsequent acts and declarations of the tenant acknowledging the relation of tenancy by promising to pay rent. Tindal, J., before considering these acts, says: "But we are also at liberty to look at the acts of the parties, than which there can not be a better means of ascertaining their intention." And Parker, J., after laying down the general rule as given by Lord Ellenborough, "that the intention of the parties, as declared by the words of the instrument, must govern the construction," adds that "subsequent acts and declarations of the parties may be looked to in aid of the construction."

Most of the instances where resort is had to acts, etc., in aid of construction, are found in cases where the meaning and application of words in old grants, in the location of highways, etc., are controlled by the signification attached to them for a series of

9—VOL. XLVI.

years by the parties or by those interested. Thus, in Wadley v. Bayliss, 5 Taunt. 782, in relation to the enjoyment of a right of way under an old award, the court held that "the language of the award being ambiguous, it was competent to go into evidence of the enjoyment had, in order to see what was the meaning of those who worded it." And in Livingston v. Ten Broeck, 16 Johns. 15, the usage of the parties under a deed was held admissible to explain its terms.

I do not understand that there is any dispute in relation to this right of explanation as to ancient grants; but the plaintiff contends that it is confined to them, and, in case of all other contracts, that the court alone can construe them, and, in making such construction, is confined to their language. To sustain this view, many cases are cited, but special attention is called to Parsons v. Miller, 15 Wend. 561. Justice Savage there says that "deeds are to be expounded by their terms where there is no ambiguity;" and says further, that "the cases cited by Mr. Justice Spencer, in Livingston v. Ten Broeck, show that the evidence (usage of parties) is proper only in case of ancient deeds." But if the justice means by ancient deeds those that are over thirty years old, he is certainly mistaken, for the very deed that in Livingston v. Ten Broeck was construed by the acts of the parties, was executed less than twenty years before the trial. The age of the deed has nothing to do with the principle involved in the question, only sufficient time must have elapsed to enable the continued acts of the parties to have given it an unmistakable construction.

Though I have found no case where the court has refused to explain an ambiguity by the unequivocal conduct of the parties, yet there seems to have been a timidity— a disposition to qualify the cases that would permit a resort to such explanations — a reluctance to depart from the old rule, that patent ambiguities can only be explained by the instrument itself. Phillips (Ev. 804) says that covenants are not to be construed by the acts of the parties, and a note to Fowle v. Bigelow, 10 Mass. 379, says the same. But I find the cases referred to (Baynham v. Guy's Hospital, 3 Ves. 295, and others) arose upon covenants

in leases where a perpetual renewal was claimed. In the case named, the Master of the Rolls says that "the courts in England, at least, bear against construing a covenant to be for a perpetual renewal, unless it is perfectly clear that the covenant does mean it," and declares that a legal instrument is not to be construed by the equivocal acts of the parties thereto. This subject is commented upon in 2 Phil. Ev. 802, note 526, where the interpretation of the various rulings is made entirely consistent with our view. The term "usage" is generally employed, but that is but a series of acts by those interested, clearly indicating, so far, their understanding; and the learned annotators, after reviewing the decisions, say: "The above decisions, which relate principally to private instruments, will be found perfectly consistent with the admissibility of usage to explain ambiguous instruments," and then quote 3 Dane's Ab. 363, § 16, where he says that it is "now, on the whole, a well-settled rule of evidence that the acts of the parties, or usage, may be proved to explain doubtful words or clauses in a deed or other sealed instruments."

So far as time and opportunity for clearly ascertaining the construction given by the parties are concerned, it is seldom that a case has arisen where they have been more fully afforded than in the case at bar. For more than twenty years the plaintiff and defendant were constantly acting under their contract, and the conduct of both parties pointed alone to one understanding. The city from time to time made orders for additional lamps, with the guarantee of the six per cent. named in the contract. The Gas Company proceeded to their erection, and regularly presented their bills for gas furnished, and during the whole period no distinction whatever was made between the price for the 263, now claimed to have been alone fixed by the contract, and the price for the additional lamps. They are not even separately stated in the bills, and in two of the earlier ones they are all spoken of as "per contract," which refers as well to price as to authority to furnish. There is only one question, then, open to consideration, and that is whether there is such ambiguity in the agreement itself as to admit of construction. The intention of the parties must be first sought in the instrument in all its parts,

in its scope and purpose, and in the circumstances in which the parties were placed; and before deciding whether we may consider the practical interpretation of the parties, we must see whether this intention is clear and unmistakable.

The contract opens with an order for 263 lamps, and further on provides for the payment of $25 a year per lamp for those "herein ordered." So far all seems plain, and if the price can only refer to the 263 lamps — if, from other provisions and the object of the agreement, no doubt can be thrown upon the intention of the parties in this regard — then the contract is not open for construction. But let us see.

Plaintiff's charter gives it a monopoly — the "exclusive privilege of erecting gaslights," etc., "in the city of St. Louis and its suburbs." This was its declared object; the terms upon which such lights were to be supplied were left to the contract, and the city could only be bound by its contract. Now what more natural than, in making arrangements for lighting the whole city, that some understanding should be had in relation to the price, not only in the small district to be lighted at once, but elsewhere, as the lamps should be extended? The first contract insured the life of the company, and, unless it were bound by some terms, placed the city at its mercy. Would the city authorities be likely to place it in that position?

On further inspecting the contract, I find, in addition to the 263 lamps expressly ordered, an agreement to furnish such additional lamps as may be ordered, of which six months' notice is to be given, with a guarantee of six per cent. profit upon the cost. I find also that, in a certain contingency, a reduction is to be provided for "in the price agreed upon in the gas furnished to the city," etc., "in virtue of this agreement." This reference to the price agreed upon for the gas of the city means the whole city, and the provision for the guarantee of six per cent. for any extension of lamps would imply that some price for the whole was fixed in the agreement—the one directly and the other by natural inference. The one shows directly that the price was fixed in the agreement, and in regard to the other, it may be fairly said, if the company was still at liberty to charge a *quantum meruit*,

why should the guarantee of profit be required? If the company were at liberty in regard to price, it could secure its own profit.

But when I look at the writing to find the price, I find it to be fixed only for the lamps "herein ordered," and I am then forced to the conclusion either that the price of the 263 was alone provided for, or that the phrase was carelessly used, and did not express the true meaning of the parties, but that they intended instead, "herein contracted for," or "herein provided for." Plausibility is given to the latter construction, not only from provisions and considerations already referred to, but from the want of precision in other parts of the instrument, as in the second paragraph the words "hereby contracted for" evidently refer to all the lamps ordered and to be ordered, while in the third paragraph the term "herein contracted for" has reference alone to those ordered.

Are not these considerations (and others might be given) enough to create a doubt whether a price was intended to be provided for all the lamps, or only the 263? One party now contends for one view, the other party for the opposite. If, for more than twenty years before this contest, the parties agreed as to what that intention was, I think they should be bound by that agreement as the best attainable evidence of their original intention.

Counsel submit an elaborate argument to show that the contract could not have extended beyond the city limits as then existing; that, so far as it operated upon the extensions, it was *ultra vires* and void. Had the contract by its terms provided for lighting the streets beyond such limits, it would have been so far inoperative as an exercise of territorial jurisdiction beyond its range. But it contained no such provision. The additional orders for lamps were all to be within the city, and the city is a unit, though with changing boundaries. There might be a question as to the extension of the exclusive rights of the plaintiff, for grants of monopolies are to be strictly construed; but there is no doubt that a city ordinance or a city contract, designed for the city at large, operates throughout its boundaries whatever their change.

As to the meaning of the contract itself in regard to its extension, the plaintiff should be estopped from seeking to limit it. The record shows that after the great expansion of the city, another gas company was organized to supply the extended limits; that it sought to enforce its right to furnish such supply, but was resisted by the plaintiff, who, in answer to a petition by the new company to restrain its interference, claimed that its monopoly extended throughout the whole city; that its original charter covered the suburbs, now the extended limits; that, in the exercise of its powers under its contract (the same contract now in controversy), it had carried its works through the new parts of the town, so as to be able to comply with this contract, had made large investments under it by works in the new limits, etc., etc. The record also shows that the orders of the city for new lamps in the extended limits were made in the same form, and complied with, and the gas paid for in the same manner as in the old city. So that it appears without dispute that for a long series of years the plaintiff has claimed, exercised, and been supported in the exclusive right of occupying, under and by virtue of this contract, the new as well as the old city limits; and now, having the ground in possession, and being able to defy competition, this company claims that it does not hold its place and power by virtue of the contract; that outside of the old city limits it is not bound by its terms, and may there charge its own price for its gas.

I do not know that I fully understand the charge of the Circuit Court in referring to the ambiguity of the terms "city of St. Louis" and "herein ordered," as arising from extrinsic facts. If by extrinsic facts were meant such facts as may be shown to explain a latent ambiguity, the term can hardly apply. "The city of St. Louis" has a meaning of which the court will take notice, and its boundaries are fixed by law, and the term "herein provided" must refer to the provisions of the contract; and its ambiguity does not arise from any extrinsic fact, but from other parts of the contract, and from its history and object. But from the whole instruction it clearly appears that the court meant to submit the inquiry to the jury whether the contract had received a construction from the acts of the parties, whether they, by

their conduct, had clearly shown their intention and meaning, as embodied in its language; and this was a question of fact, and not of law.

The other judges concurring, the judgment will be affirmed.