E. H. WOOD, IRA A. CUMMINGS, and H. R. WILLIAMS, TRUSTEES, RESPONDENTS, v. WHITE EAGLE OIL & REFINING COMPANY, DEFENDANT, LEEWARD PETROLEUM CORPORATION, INTERVENER, APPELLANT.

Kansas City Court of Appeals. June 15, 1925.

**1.—Courts—Jurisdiction—Amount of Judgment Determines Jurisdiction and Not Value of Oil Interest.** In a suit to recover proceeds of past production of oil interest, the value of which was as much as $10,000, did not place jurisdiction of case in Supreme Court, the amount of the judgment determining jurisdiction.

**2.—Evidence—Where Assignment Free from Ambiguity Parol Evidence Was Not Admissible to Change Scope of Instrument.** An assignment specifically stating in contractual part that an undivided one-eighth interest in oil and gas produced from land under lease was assigned to plaintiffs, held to plainly convey one-eighth interest in oil and gas produced, and being free from ambiguity parol evidence was not admissible to show interest of assignor.

**3.—Construction—Where Transfer Order Was Instrument Different in Character from Assignment of Oil Interest, the Same Could Not be Construed Together.** Where assignment of undivided one-eighth interest in oil and gas from land under lease was a complete instrument within itself and transfer order executed in order buyer would know to whom purchase price of oil was to be paid and divided and reciting that assignees were entitled to one-eighth "working interest" was not consistent therewith and executed for different purpose and where they were not delivered at same time, transfer order held not essential part of assignment so as to construe the two instruments together.

**4.—Evidence—Where Assignment Was Unambiguous, Evidence of Conduct of Parties After It Was Made Not Competent for Purpose of Throwing Light on Its Meaning.** Where terms of assignment were not ambiguous, evidence of conduct of parties, after assignment was made, was not competent for purpose of throwing light upon its meaning.

**5.—Estoppel—Assignee of One-eighth Interest in Oil and Gas Lease Held Not Estoppel from Denying that Interest Was Working Interest.** Assignees of one-eighth oil and gas interest held not estopped by execution of transfer order, trust agreement or declaration of trust to which transferee of remaining interest of assignor, was a stranger, or by conversation during which transferee computed interest of assignee, from denying that interest was one-eighth working interest, entitling them to only three-thirty-seconds of the oil, as recording of assignment was constructive notice of terms thereof and transferee was negligent in not discovering therefrom interest conveyed to assignees.

**6.—Where Facts Are Known to Both Parties or They Have Equal Means of Knowledge, There is No Estoppel.** When the facts are known to both parties or they have equal means of knowledge, there is no ,estoppel in favor of either.

**7.—Same—Estoppel Cannot Arise in Favor of One Guilty of Contributory Negligence.** Estoppel cannot arise in favor of one who has been guilty of contributory negligence.

**8.—Laches—Mines and Minerals—Assignee of Interest in Oil and Gas Lease Held Not Barred by Laches from Claiming Full Interest Therein.** Where one-eighth interest in oil and gas lease was assigned to plaintiffs and thereafter remaining interest of assignor was transferred to intervener, who was not prejudiced by anything done by plaintiffs thereafter, and prior thereto had knowledge of plaintiffs' action for one-eighth of proceeds of oil produced instead of three-thirty-seconds theretofore paid, held not barred by reason of laches.

**9.—Same—Question of ʻLaches Addressed to Sound Discretion of Chancellor.** The question of laches is addressed to sound discretion of chancellor.

---

*Corpus Juris-Cyc. References: Contracts, 13CJ, p. 528, n. 50; p. 529, n. 53; Courts, 15CJ, p. 1088, n. 22; Equity, 21CJ, p. 218, n. 3; p. 219, n. 4; p. 221, n. 26; p. 223, n. 28, 30; p. 225, n. 37; Estoppel, 21CJ, p. 1103, n. 65; p. 1131, n. 71; p. 1169, n. 60; p. 1170, n. 63; p. 1218, n. 83; Evidence, 22CJ, p. 1117, n. 68; p. 1127, n. 42; p. 1141, n. 47; p. 1177, n. 49; p. 1178, n. 50; p. 1181, n. 65.

Appeal from the Circuit Court of Jackson County.—Hon. Willard P. Hall, Judge.

Affirmed.

*Turpin & Behrendt* for appellant.

*Harkless & Histed* for respondents.

BLAND, J.—This is a suit by plaintiffs to recover from the defendant, White Eagle Oil & Refining Company, the sum of $4030.20, representing the balance due plaintiffs by reason of the sale to defendant of a one-thirty-second part of oil that had been produced from certain wells located in Marion county, Kansas. The petition originally prayed for the sum of $3617.58 but as oil continued to be produced the petition was subsequently amended so as to ask for $4030.20. The defendant answered admitting that it had in its possession the money but pleaded that it was being claimed by

the Leeward Petroleum Corporation. With the consent of plaintiffs the Leeward Petroleum Corporation was made a party and filed an intervening petition claiming the money. At the conclusion of the testimony the chancellor rendered a decree awarding the fund to plaintiffs and intervener has appealed.

The facts show that the owner of the fee in one hundred sixty acres of land in Marion county, Kansas, executed on the land in favor of one Forrester an oil and gas lease, reserving a royalty of one-eighth part of the oil. Forrester assigned the lease so far as it affected the forty acres now in controversy to one Curtis. Curtis in turn assigned it to Aikens, reserving to himself a one-eighth royalty in the oil. By *mesne* conveyances the lease to the forty acres was assigned, "insofar as it covers a three-fourths interest in the oil and gas produced from" said forty acres to D. M. Ward and J. C. Wilhoit. On June 2, 1921, Ward assigned to intervener "an undivided three-eighths interest in . . . said quarter section." On June 22, 1921 Wilhoit, being the owner of a three-eighths interest, assigned a one-eighth interest to plaintiffs, the material parts of this assignment reading as follows:

"Whereas, the said lease and all rights thereunder or incident thereto are now owned by J. C. Wilhoit, as to an undivided three-eighths (3/8) interest in the Northeast quarter (NE¼) of the above-described quarter section,

"Now, Therefore, for and in consideration of one dollar (and other good and valuable consideration) the receipt of which is hereby acknowledged, the undersigned, the present owner of the three-eighths interest in the said lease and all rights thereunder or incident thereto, does hereby bargain, sell, transfer, assign and convey unto Frank S. Land, Ira A. Cummings and E. H. Wood, as trustees, heirs, successors and assigns, *an undivided one-eighth* (1/8) *interest* carried free from expense of operation and development *in the oil and gas produced from said* Northeast quarter of the northeast quarter (NE¼ of NE¼) of Section 8, Twp. 22, Rge. 4 East, Marion County, Kansas, *under said lease*." (Italics ours.)

This instrument was filed for record in Marion county, Kansas, on June 23, 1921, and duly recorded.

Plaintiffs contended at the trial and now contend that the assignment from Wilhoit to them is conclusive on the question as to what interest plaintiffs have in the oil and having introduced the assignment in evidence, rested. All the evidence introduced by the intervener was objected to by plaintiffs but the court received the same subject to the objections and at the conclusion of all the testimony sustained the objections thereto except "in so far as it (the evidence) relates to the issues of estoppel."

Intervener's evidence shows that on June 22, 1921, Wilhoit and plaintiffs executed a "transfer order" directed to the Prairie Oil & Gas Company, the buyer of the oil produced from the forty acres. This transfer order recited that Wilhoit had sold and transferred a part of his interest in the wells located on the forty acres therein described to plaintiffs; said interest being described as a "one-eighth (1/8) carried working interest." On May 31, 1922, Wilhoit assigned all of his remaining interest in the lease as to the forty acres to intervener. This conveyance to intervener recited that the interest owned by plaintiffs was a "one-eighth (1/8) working interest carried free from expense of operation and development," etc.; that the transfer from Wilhoit to plaintiffs was "recorded in the office of the Register of Deeds for Marion county, Kansas, in Book 20, of Miscellaneous records at page 432;" that Wilhoit was the owner of a one-eighth interest in the total oil run "less the shares payable to plaintiffs;" that "all rental, royalties and profits have been paid except those growing out of the transfer" to plaintiffs. This assignment to intervener was dated May 31, but went into effect the latter part of August, 1922.

Intervener introduced evidence showing that the words "carried working interest," used in the transfer order and other documents to be hereinafter described, meant that the working interest must pay for the cost of development and operation and that the part of the working interest carried (carried free) would not be subjected to that expense. Intervener's evidence further tended to show that the part of the interest reserved by the owner of the land for himself is called a royalty interest; that the interest that the lessee gets is called a working interest; that where the owner reserves a one-eighth interest as royalty and a subsequent lessee reserved to himself another one-eighth of the total production, the total royalty is one-fourth; that the term "working interest" is one used in the oil business and generally understood by those engaged in that business to be the interest owned by the parties owning (working) the lease; that the working interest is that part left after taking out the royalty; that if the royalty is one-fourth, one-eighth of the working interest would be one-eighth of what was left, that is, of three-fourths, or three-thirty-seconds. Here is where the difference between the parties lies. Plaintiffs under the assignment of the lease from Wilhoit, claim the right to four-thirty-seconds or one-eighth of the total production of oil, while the intervener claims that plaintiffs are entitled to only one-eighth of the working interest, which would be three-thirty-seconds of the total production. The controversy, therefore, is over the ownership of a one-thirty-second of the total production.

Intervenor's evidence further shows that the buyer of the oil upon taking over the production requires what is called a "division order" to be signed by the owners of the oil. This division order is furnished by the buyer and contains a form for the name and correct description of the land. It requires that the royalty interest be specified in the order together with the working interest, and is signed by the parties interested. When it is returned to the buying company it is sent by it, with a complete abstract of title covering the property brought down to date, to the buyer's attorney, who examines the abstract and if it is found that the division order corresponds with the title, the order is approved and payment for the oil purchased is made in accordance with the information contained in the division order. Thereafter if any one sells a part of his interest it is required that the seller and purchaser sign what is called a "transfer order" showing what interest has been transferred and thereafter payment of the oil is made in accordance with the division order as amended by the transfer order.

The intervener was the actual operator of the wells and attended to securing the proper papers required by the Prairie Oil & Gas Company, the buyer of the oil. The transfer order in question was sent to plaintiffs by the intervener to be signed; the intervener also sent plaintiffs, who resided at Kansas City, Missouri, a trust agreement to be executed by them. The evidence is that where the division or transfer order shows that the title to a part of the oil appears in trustees, the buyer requires the execution of a trust agreement setting forth and giving information as to the beneficiaries and their interests. The Prairie Oil & Gas Company furnished a form of trust agreement to intervener, who was in active charge of the wells and the business of disposing of the oil, with the request that it see that it was properly executed. Said trust agreement was executed on July 13, 1921, by the trustees. The trust agreement recited that the trustees were "the legal owners of a one-eighth (1/8) working interest of wells," etc. On June 27, 1921, a declaration of trust was executed by plaintiffs and recorded in the records of the Recorder of Deeds in Kansas City, Missouri, the trustees and beneficiaries living in that city. Attached to the trust agreement was a list of property held in trust by plaintiffs for the beneficiaries and it was recited therein that among other property owned was "an undivided one-eighth (1/8) interest carried free in oil and gas lease covering land described as follows." Then appears a description of the forty acres of land in controversy.

Checks were sent by the Prairie Oil & Gas Company twice each month to the various persons owning the oil bought by it, the

proceeds of the oil being divided by it in accordance with the information obtained from the division and transfer orders. That company paid on the basis that plaintiffs were entitled to a one-eighth working interest or three-thirty-seconds of the gross production of the oil. The checks sent to plaintiffs were in the form of vouchers containing information that they were in payment of a certain number of barrels of oil run during a certain time and only one of the vouchers (this being the first one sent) recited that it was in payment of a "one-eighth W. I. in oil run." It was shown that in the oil business "W. I." means working interest. None of them recited that plaintiffs were receiving "3/32nds" of the oil.

Shortly after the intervener purchased the remainder of Wilhoit's interest, the White Eagle Oil & Refining Company, defendant herein, took over the production from the forty acres, and a division order was executed to it at the time. This division order was signed by plaintiffs together with intervener and other interested parties and recited that plaintiffs were the owners of a "one-eighth carried W. I., being twenty-five per cent of the 3/8ths W. I." The testimony of Mr. Wood, which will be hereinafter referred to, shows that he attended to the business for plaintiffs and that when the intervener sent this division order to him to be executed it contained the above information but that it was the understanding that this was to be changed by the intervener before turning it over to the White Eagle Oil & Refining Co. After the production was taken over by the White Eagle Company, which was on September 16, 1922, that company sent to plaintiffs semi-monthly checks covering 6/64ths (3/32nds) of the gross production; these checks were cashed by plaintiffs.

In rebuttal Wood testified that at the time of all these transactions he lived in Kansas City and was a farmer engaged in the cattle business; that he entered into a contract with Wilhoit agreeing to organize what was known as the "Big Boosters' Syndicate" for the purpose of developing oil and gas leases owned by Wilhoit and his associates in Marion county, Kansas, and Hughes county, Oklahoma. A letter was introduced in evidence, in connection with Wood's cross-examination, from Wilhoit to Wood, dated June 21, 1922, in which it was recited that the syndicate was to consist of 260 units to be sold for not less than $250 per unit as described in the declaration of trust we have mentioned, supra. The letter further recited that Wood was to "put on" a selling campaign paying all of the expenses thereof and was to have a commission of twenty per cent of the proceeds, and an "undivided one-fourth *working interest* in the leases upon certain described land in Hughes county, Oklahoma." Wood testified that this was his first experience in the oil business; that plaintiffs bought the one-eighth

220 Mo. App.—64.

interest in the Marion county, Kansas, land about the time the first well was brought in upon the forty acres; that when he received their returns from the Prairie Oil & Gas Company he and his associates, being unfamiliar with the oil business, did not question them, supposing that they were getting a full one-eighth interest, that was what they thought they had bought; that after the White Eagle Company took over the run, the first return showed that they were being paid for six-sixty-fourths of the interest instead of four-thirty-seconds, and that plaintiffs "went along for a while expecting to get the thing settled, nothing came of it so that we went over to the White Eagle to put in a protest and they held up all the oil from that lease." Wood admitted that plaintiffs cashed all the checks they had received from the White Eagle Company, which were four in number, and that he knew that the Leeward Petroleum Corporation was entitled to the one-thirty-second part in question if the plaintiffs were not, but that he did not say anything to that company about plaintiffs' claim to the one-thirty-second and presumed that the first that that company knew about it was when it learned it from the White Eagle Company.

The protest was made to the White Eagle Company sometime in November, after that the company held up the payments. Thereafter Mr. Ward, of the Leeward Petroleum Corporation, came to Kansas City to find out why it was not getting its money. Wood testified that at this time he and Ward looked at the assignment from Wilhoit to plaintiffs, and that the witness told Ward that they had bought a full one-eighth interest but that the White Eagle Company was paying for only three-thirty-seconds of the oil; that Ward read over the assignment and they went to the White Eagle Company's office and talked to the agents of that company about it; that the division order was examined and Ward said "it looked very much like they (plaintiffs) were entitled to more than they were getting . . . You get your assignment here and let me see it and if your escrow agreement reads like your assignment, it looks like you are entitled to one-thirty-second, which you have not been getting." Wood testified that they could not find the escrow agreement. He further testified that he did not know anything about what was meant by "working interest;" that they, the plaintiffs, were entirely unfamiliar with oil terms at that time; that they supposed that they were receiving from the Prairie Oil & Gas Company what they were entitled to; that he had never inquired as to what a working interest meant until he "had this trouble." The witness further testified that when the White Eagle Company's division order was sent for him to sign it read that plaintiffs' interest was a one-eighth working interest and "right in it it said three-thirty-seconds." So the witness called

up Ward over the long distance phone and told him that the order was wrong in describing plaintiffs' interest as three-thirty-seconds and Ward said it was an error made in his office and they should sign the order and send it back and he would correct it. Wood signed the division order and sent it to Ward. The letter in which it was mailed and which was introduced in evidence does not say anything about the correction Ward was to make, but Wood explained this by saying that the matter was settled in the telephone conversation and that it was not necessary to mention it in the letter.

Ward testified that after the White Eagle Company held up the payments he went to Kansas City to find out the cause and had a talk with Wood but denied that he told Wood that if the assignment read as Wood claimed that the latter was entitled to the one-thirty-second interest in question. He testified that he went to see Wood and that the latter had the assignment and he thought they took it to the White Eagle Company and when they were there he looked it over and told Wood that it looked as though possibly they (plaintiffs) were entitled to more than that but before he could say he wanted to see all the papers in connection with it, including all of those covering Wood's dealing with Wilhoit. Ward admitted that Wood called him over the telephone in reference to the division order for the White Eagle Company but stated that Wood made no complaint but merely asked him if it was all right, and the witness said "Yes, it was the same amount you have always been paid by the Prairie," and Wood replied "All right I will take care of it."

Ward further testified that he never learned that plaintiffs were claiming more than three-thirty-seconds of the oil until after the payments were held up by the White Eagle Company; that he did not think that he had ever talked with any of the plaintiffs except Wood as to what plaintiffs were entitled to before the intervener purchased the remaining interest of Wilhoit; that he had several conversations with Wood before that purchase was made but that Wood's questions were not "directed particularly" as to the amount of the oil that plaintiffs were entitled to "only that he asked the witness once whether they were getting all the oil that they were entitled to;" he told Wood that so far as he knew they were. Ward testified that he "never had any discussion with Mr. Wood as to whether he and his associates were entitled to three-thirty-seconds or four-thirty-seconds;" that in May or June, 1922, before the intervener purchased from Wilhoit, Wood asked the witness to estimate for him what he ought to get out of the property; that he wanted to know whether to sell part of his interest in the Big Boosters' Syndicate; that the witness told him that he

could not tell him but that if Wood would come into the office before Wood went back to Kansas City that "he would sit down and figure it out for him." Later the two went to the office and the production records were produced and Ward said to Wood, "I will have to figure out what you have already received;" that "they went over the production and estimated it and they had before them the production records so that they could ascertain how much had been received; that after going over the figures Mr. Wood said 'I think I will hang on to my unit;' that they had the gross production of the wells before them then." The witness testified later that in estimating the amount of Wood's part of the production, *they* figured Wood's interest at "three-thirty-seconds of the gross oil."

Ward and Lee, the latter being another person interested in the Leeward Petroleum Corporation, testified that in buying the interest from Wilhoit they went over the various production records and the number of barrels of oil that the parties had received and looked at the division and transfer orders and found that Wilhoit's remaining interest, after his assignment to plaintiffs, was nine-thirty-seconds of the oil, and that plaintiffs' interest was three-thirty-seconds or one-eighth of the working interest; that they bought from Wilhoit on this basis. The agent of the Prairie Oil & Gas Company stated that when it took over the production of oil from any source, it had the title to the property looked up to see that the interests set out in the division order were correct, that they would not have any further examination made when a transfer order was thereafter presented to them.

Ward testified that in the oil business the original approval of the title by the buying company was considered sufficient to subsequent purchasers' interest in the lease, that they merely examined the transfer order. Both Ward and Lee testified that in buying Wilhoit's remaining interest they made no inspection of the records of the Register of Deeds in Marion county, Kansas; that they were twenty miles from the county seat and that they had the transfer order before them; that the transfer order was sufficient. There was evidence on the part of the defendant that even if the agents of the Leeward Petroleum Corporation had examined the records and read the assignment from Wilhoit to plaintiffs, they would have come to no other conclusion but that Wilhoit was still entitled to the one-thirty-second interest in question; that in the practice of the oil business, when an assignment or lease is made and no royalty reserved to the assignor, that which is assigned is an interest in the lease or the working interest, and that when a lease read that a one-eighth interest was assigned it meant one-

eighth of the working interest and not one-eighth of the total gross production of oil.

At the conclusion of the testimony the chancellor gave a declaration to the effect that taking the evidence in its most favorable light to intervener, it was not entitled to recover. This is not important as this is an equity case, it merely shows on what theory the trial court decided the case.

Ward testified that the one-thirty-second interest in controversy would probably run between $350 to $400 per month in the future, "for a year at least, probably for a year and a half," and that the value of that interest was worth as much as $10,000, and so it is claimed by the intervener that the jurisdiction of this case is in the Supreme Court. There is no merit in this contention; the amount of the judgment determines the jurisdiction in this case. [Foundry & Mfg. Co. v. Moulders' Union, 251 Mo. 448.]

It is insisted that there is an inconsistency in the terms of the assignment from Wilhoit to plaintiffs in that it is recited that Wilhoit was the owner of an "three-eighths interest in said lease" and in another place that he was the owner of an "undivided three-eighths interest in the . . . quarter section" and that we should look to other writings found in the record and the conduct of the parties in construing this assignment. Whether or not the words "three-eighths interest in said lease" means a three-eighths interest in three-fourths of the oil which the owners of the lease were entitled to after deducting the amount of the royalties, as contended for by the intervener, there is no question but that Wilhoit at the time of the assignment was the owner of at least an undivided one-eighth interest in the oil and gas produced from said quarter section of land. The recitation in the assignment as to what interest Wilhoit owned is not material for the reason that the assignment specifically states in the contractual part that "an undivided one-eighth interest . . . in the oil and gas produced from" the land "under said lease" was assigned to plaintiffs. These words are full and complete. They are not ambiguous and are not open to explanation. On their face they plainly conveyed a one-eighth interest in the oil and gas produced under the lease to the quarter section. "Where a transfer or assignment is clear and free from ambiguity parol evidence is not admissible to change the scope of the instrument." [22 C. J., pp. 1141, 1177, 1178, 1127, 1117; Minnesota Mfg. Co. v. Lumber & Hardware Co., 81 Mo. App. 255.]

It is claimed that the transfer order given to the Prairie Oil & Gas Company is of equal dignity with the assignment from Wilhoit to plaintiffs; that the two should be construed together and as the transfer order recites that plaintiffs were entitled to a one-eighth

*working interest,* the two instruments taken together show that plaintiffs are not entitled to the one-thirty-second part of the oil in question.

"Where several instruments are made as part of one transaction, they will be read together, and each will be construed with reference to the other. This is true, although the instruments do not in terms refer to each other. So if two or more agreements are executed at different times as parts of the same transaction they will be taken and construed together. Where contracts or writings are in fact independent, however, they should not be considered together, although the parties may be the same, or the same subject-matter may be concerned." [13 C. J., pp. 528, 529.] [See, also, Advertising Co. v. Publishing Co., 146 Mo. App. 90, 98, 99.]

The Transfer order was an instrument different in character from the assignment. While they were executed on the same day there is no testimony that they were made a part of the same transaction. They were not delivered at the same time *to accomplish an agreed purpose* and this is one of the essential elements necessary in order to construe the two instruments together. [Advertising Co. v. Publishing Co., supra, l. c. 99.] The purpose of the assignment was to transfer a certain interest in the outrun of oil to plaintiffs; the purpose of the transfer order was to comply with requirements of the Prairie Oil & Gas Company, which required such a transfer in order to know to whom the purchase price of the oil was to be paid and how divided. The assignment was a complete instrument within itself, it was not necessary to have any other paper to carry the agreement of the parties into effect. The transfer order was directed to the Prairie Oil & Gas Company and, as before stated, was for an entirely different purpose than the assignment. If the transfer order were construed as contended for by the intervener (and there is no testimony in the record tending to dispute its evidence showing what is meant in the oil business by the words, working interest), then there is an inconsistency between the two instruments which would make it difficult, if not impossible, to construe the two together. The parties to the assignment conclusively settled the question as to the right and title conveyed to plaintiffs to the oil produced under the oil and gas lease. If there are circumstances when the assignment and division or transfer orders can be construed together, it is only when they are consistent. [Archer's Law and Practice in Oil and Gas Cases, p. 143, sec. 18.]

The case of Ball v. Red Square Oil & Gas Co., 216 Pac. 433 (Kansas) has no bearing on the case at bar. The only matter passed on in that case was the question of liens for labor and material furnished in the operation and development of the lease. It was held

that the lien extended to the entire lease. The assignment in that case, however, was different from the one in this case. In that case it was of a seven-eighths interest in *the lease* while in this the assignment was a one-eighth interest "in the oil and gas produced."

Evidence of the conduct of the parties, after the assignment was made, was not competent for the purpose of throwing light upon its meaning.

"Evidence of the practical construction given to an instrument of writing by the parties thereto may be admissible to explain its meaning when explanation is necessary. This rule does not, however, extend so far as to permit the overthrow of plain terms of a contract, and an unambiguous contract cannot be varied by evidence of a construction by the parties different from that which the language clearly imports. [22 C. J., pp. 1180, 1181.]

"It is true that when there is a latent ambiguity in a description of land, the circumstances and situation of the parties, and the construction they have put upon the deed by their acts, are admissible in evidence. [Tetley v. McElmurry, 201 Mo. 382; Gas Co. v. St. Louis, 46 Mo. 121; Union Depot Co. v. Railroad, 131 Mo. 291.]

"But it is also true that when the language of the deed contains no ambiguity, or when such language applied to the subject-matter and circumstances leaves no substantial doubt as to the property conveyed by the deed, then the acts of the parties under the deed are inadmissible." [Korneman v. Davis, 281 Mo. 234, 242.] [See, also, Gas Co. v. City of St. Louis, 46 Mo. 121, 128.]

In the case at bar there is no necessity for explaining the terms of the assignment. As before stated, it is plain and unambiguous and on its face contains the entire agreement, nothing having been left out. In the case of Williams v. Santa Fe Ry. Co., 153 Mo. 487, cited by intervener, the court did not consider the conduct of the parties for the purpose of disputing the terms of the contract.

It is insisted that the intervener in buying the remaining interest of Wilhoit acted upon a situation created by the plaintiffs and the latter are now estopped from denying that the intervener is entitled to the one-thirty-second part of the oil in question. It is alleged that this situation created by plaintiffs, was brought about by their signing the transfer order and the declaration of trust, the trust agreement, the receipt by plaintiffs of three-thirty-seconds of the outrun of the oil from the Prairie Oil & Gas Company and the conversation between Ward and Wood when Wood asked the former for information concerning the value of the latter's holdings. Of course, anything that plaintiffs did after the intervener bought the remaining interest of Wilhoit, which was a short time before the taking over of the run by the White Eagle Company, cannot be con-

sidered in this matter. There is no evidence that intervener knew anything about the declaration of trust at the time in question.

We think there is no estoppel in this case for several reasons. In the first place the intervener was not a party to the transfer order, the trust agreement or the declaration of trust nor was any of them addressed to plaintiffs. Intervener was a stranger to the transfer order, the trust agreement and the declaration of trust and the receipt by plaintiffs of the money from the Prairie Oil & Gas Company. [Hase v. Schotte, 109 Mo. App. 458; Blodgett v. Perry, 97 Mo. 263; Cottle v. Sydnor, 10 Mo. 763; 21 C. J. 1218.]

As to the Ward-Wood conversation last referred to, the record is not as clear as it might be. Ward testified that Wood's questions were not directed particularly to the amount of oil that plaintiffs were entitled to; that Wood asked Ward to estimate what "ought to come out of the property." It seems that Ward did the estimating and that his estimate was based upon the *entire* production of the wells. Ward first testified that they did not have any discussion as to whether plaintiffs "were entitled to 3/32nds or 4/32nds." Later on he testified that "they figured Wood's interest at 3/32nds of the gross." Taking all of the witness's testimony, it would appeal that Ward did the "figuring" and not Wood. There is no evidence that Wood acceded to these figures unless he participated therein, which we think the evidence fails to show. While Wood did not expressly deny that *"they"* did the figuring, his whole testimony is a denial of any such circumstance. No doubt the failure to specifically deny it was because he and his counsel did not construe Ward's testimony as the intervener now construes it. The weight of the evidence certainly is to the effect that plaintiffs never represented to intervener that they were entitled to only 3/32nds of the oil. In this connection it will be recalled that even under Ward's version of the conversation with Wood, after the payment from the White Eagle Company were held up, he did not say or indicate that plaintiffs had deceived intervener in any way. In this connection Ward testified that he did not "recall whether he had specifically told him (Wood) that he had relied on that (that plaintiffs were getting 3/32nds) when he purchased the oil from Wilhoit."

In the second place, the recording of the assignment was constructive notice to the intervener of the terms thereof and the assignment of Wilhoit's remaining interest to intervener recites the book and page in which plaintiffs' assignment was recorded and contains a description of it, though an erroneous one. While intervener's assignment recites that plaintiffs' assignment was a "one-eighth working interest," that recitation is immaterial for the reason that plaintiffs' interest was not a one-eighth working

interest and plaintiffs' assignment having been on record, the intervener must be held to have known of the true title, plaintiffs not having actively misrepresented the true situation to the intervener. [Olden v. Hendrick, 100 Mo. 533, 537; 21 C. J., p. 1103.] As before stated, plaintiffs did nothing to mislead the intervener that the latter was entitled to rely upon. It is well settled that when the facts are known to both parties or they have equal means of knowledge, there is no estoppel in favor of either. [21 C. J., p. 1131; Blodgett v. Perry, supra, l. c. 272, 273; Bader v. Mill & Lumber Co., 134 Mo. App. 135; Grafeman Dairy Co. v. Bank, 235 S. W. 435.]

There is another reason why there is no estoppel in the case. "In no event can estoppel arise in favor of one who has been guilty of contributory negligence." [21 C. J. 1170.] In buying Wilhoit's remaining interest the intervener knew the book and page where plaintiffs' assignment was recorded. Intervener's agents were clearly negligent in not going to the record and finding out what was the true interest conveyed by the assignment of Wilhoit to plaintiffs. As before stated, that assignment and that alone fixed the interest that was conveyed to plaintiffs. Any one of ordinary diligence when buying an interest in real estate in order to determine what interest the grantor had, would not fail to examine the records or have them examined. This was particularly important in this case because the intervener was buying only the interest left in Wilhoit after the conveyance to plaintiffs, the conveyance of Wilhoit to the intervener was expressly made subject to plaintiffs' conveyance. It is no excuse under the circumstances to say that they relied upon the transfer order. The fact that the county seat was twenty miles distant from the seat of operation is likewise no excuse. Intervener was also negligent in sending the transfer order to plaintiffs and having it executed by plaintiffs when it knew that it did not properly describe their interest.

It is held that a person to be estopped must have known of his rights. [Miles v. Popp, 192 S. W. 424.] But if another is misled by the culpable negligence of the party, the latter is estopped, if all of the other circumstances are present giving rise to an estoppel. [21 C. J. 1169.] It is not necessary from what we have said to decide whether plaintiffs were negligent in not finding out what the money they received from the Prairie Oil & Gas Company represented, it being the uncontradicted evidence that it represented a three-thirty-seconds of the production instead of four-thirty-seconds. We think there is no question but that they did not know as a matter of fact for what proportion of the oil they were being paid and did not know the meaning of "W. I." or "working in-

terest." As before stated, there is no estoppel in this case and the fact that plaintiffs were negligent, if they were, is not material.

We have examined intervener's cases. They are not in point, most of them involve representations made directly to the person urging the estoppel or involve the question of parties to the transaction or their privies.

It is insisted that plaintiffs were barred by reason of laches. To constitute a defense of laches—

". . . the delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible, as through loss or obscuration of evidence of the transaction in issue, or there must have occurred in the meantime a change in conditions that would render it inequitable to enforce the right asserted, or, as commonly phrased, the delay must have worked injury, prejudice or disadvantage to defendant or others adversely interested, or plaintiff must have abandoned or waived his right, or acquiesced in the assertion or operation of the adverse right, or lost his own right by estoppel; or sufficient time must have elapsed to create or justify a presumption against the existence or validity of plaintiff's right; or a presumption that if plaintiff was ever possessed of a right, it has been abandoned or waived or has been satisfied, or that in consequence of the delay the adverse party would be inequitably prejudiced by the enforcement of the right asserted." [21 C. J. 223, 225.]

The question of laches is addressed to the sound discretion of the chancellor. [21 C. J., pp. 218, 219.] Intervener was not prejudiced by anything that was done by plaintiffs after the assignment from Wilhoit to it, and before that time, as intervener had knowledge of plaintiffs' title, there could be no laches. Other reasons might be stated here why there was no laches in this case but it is unnecessary to go further into the question.

From what we have said the rulings of the chancellor on the evidence was as favorable to intervener as it was entitled to.

The judgment is affirmed. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.